UNITED STATES DISTRICT COURT

IN THE EASTERN DISTRICT OF MICHIGAN

**CLIFTON E.  JACKSON and**
**CHRISTOPHER M. SCHARNITZKE,**

      Plaintiffs, on behalf of themselves and
      other persons similarly situated

> **There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.**

**SEGWICK CLAIMS MANAGEMENT**
**SERVICES, INC, and**
**COCA COLA ENTERPRISES, INC,**
**foreign corporations, and**
**DR. PAUL DROUILLARD,**
**Jointly and Severally,**

      Defendants.
_____/
Marshall Lasser P25573
MARSHALL LASSER PC
Attorney for plaintiffs
po box 2579
Southfield MI 48037
248-647-7722
_____/

**CIVIL RICO COMPLAINT AND JURY DEMAND, AND REQUEST FOR CLASS CERTIFICATION**

**JURISDICTION AND VENUE**

1.     Federal question jurisdiction is conferred by plaintiffs' claims under the Federal Racketeer Influence and Corrupt Organizations Act, 18 USC §1961 et seq (RICO).   Diversity of citizenship jurisdiction is conferred by 28 USC §1332 (plaintiffs are citizens of Michigan, defendants except Dr. Drouillard are citizens of other states, and the amounts in controversy exceed

$75,000).   2.      Venue is properly laid in the Federal District Court for the Eastern District of Michigan because plaintiffs reside in that district and defendants do business in person and through their agents and representatives in that district, in Wayne and Oakland Counties, Michigan.

3.  The predicate acts complained of herein involve interstate commerce and the inter and intrastate use of the United States mails and electronic communications, and mail and wire fraud in violation of 18 USC 1341 and 1343.

PARTIES

4.      Plaintiffs Clifton E. Jackson and Christopher M. Scharnitzke reside within the jurisdiction of this district court.  They were or are employees of Coca Cola Enterprises (Coke). Coke and Sedgwick Claims Management Services (Sedgwick) are corporations domiciled outside Michigan.  Dr. Paul Drouillard resides in Michigan, working in Wayne County and residing in or near Wayne County.

ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

5.      This case arises under the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. 1961 through 1968.

6.      Coke employed the plaintiffs.  It complied with its obligation to provide its Michigan employees Michigan workers disability compensation insurance by signing a contract of insurance and or claims administration with Sedgwick.  On information and belief, the contract between Coke and Sedgwick effectively and perhaps contractually made Coke a self-insured for all or most of its workers compensation losses.

7.      Sedgwick adjusted the Michigan workers compensation claims out of an office in or near Chicago IL or Kentucky.

2

8. Decisions regarding paying or denying Michigan workers compensation claims, and selecting doctors to do medical examinations of claimants, were made by Sedgwick and or Coke, or by Sedgwick after consulting with Coke and with workers compensation defense attorneys, or were ratified by Coke after being made by Sedgwick in consultation with its workers compensation defense attorneys. Sedgwick and the same attorneys worked together in handling Michigan workers compensation claims for other Michigan employers, such as DHL Holdings. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery. All Notices of Dispute (NODs) mentioned in this complaint were mailed via the US mails to the injured worker and to the State of Michigan Workers Compensation Agency ("the Agency").

9. **The Enterprise or Enterprises.** The allegations in this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery. The workers compensation personnel at the workers compensation claims departments at Sedgwick and Coke, handling Michigan workers compensation claims and associating in fact, formed an "enterprise" for purposes of the Racketeer Influenced and Corrupt Organizations Act (RICO) claims in this case. These persons included, inter alia, La Tara Lewis. Because they worked together regularly in adjusting and handling workers compensation claims for Coke Michigan workers, they formed an organization. The personnel at Sedgwick who handled Coke's Michigan workers compensation claims, and the Michigan defense attorneys who worked with Sedgwick on those claims, also handled Michigan workers compensation claims for other employers, such as DHL Holdings. The names of other persons in the enterprise are not known to plaintiffs. Additionally or alternatively, the following persons or entities are an "enterprise" which

3

acted to defraud plaintiffs of their workers compensation benefits:

    (2) the workers compensation claims personnel at Sedgwick who handled Michigan claims;

    (3) the workers compensation claims personnel at Sedgwick who handled Michigan claims, plus Dr. Drouillard;

    (4) the workers compensation claim personnel at Coke and Sedgwick handling Michigan claims, plus Dr. Paul Drouillard;

    (5) the workers compensation defense attorneys may be and may have been part of the enterprise.

    10.    Each enterprise was an organization which existed not only for the purpose of defrauding plaintiffs of their workers compensation benefits; the enterprise engaged in other activities, such as the administration of workers compensation claims and the examination of individuals claiming workers compensation and other benefits. Each enterprise has existed for many years, and in each enterprise different persons had different roles concerning the conduct of the enterprise, not limited to the commission of the fraudulent acts complained of herein.

    11.  Two or more enterprises may have acted together to defraud one or more plaintiffs of their workers compensation benefits.

    12.    One or more of these persons or entities committed mail fraud, wire fraud and or conspiracy to defraud, in a repeated and continuing pattern extending over years applicable to plaintiffs and other MI employee of Coke, by fraudulently terminating or denying benefits, by writing fraudulent medical reports and giving fraudulent deposition testimony, by hiring a doctor such as Paul Drouillard whom defendants knew would frequently give false testimony and or write false medical reports, by failing to honestly and in good faith review a claim as required by

Michigan statute before denying the claim, and or by fraudulently terminating benefits because a person refused to settle a claim for the amount offered by Coke and Sedgwick.  Defendants used the mails and wires in furtherance of this scheme, by mailing, emailing and or faxing Notices of Dispute and other communications.

13.    At times this fraud involved Coke's and Sedgwick's repeated and frequent employment of "cut off" doctors such as Dr. Paul Drouillard, that is, doctors whom Coke and Sedgwick knew would reliably write them a report stating a claimant did not have a work-related disability whether or not such disability actually existed; Coke and Sedgwick used these "cut off" reports as a grounds to cut off benefits which were being paid or to deny benefits before any were paid; Coke and Sedgwick then cited the report in a Notice of Dispute filed with the Agency as the grounds for cut off or denial of benefits.  Defendants referred to the examinations as "independent medical examinations" (IMEs) but they were not independent because the doctor received tens of thousands or hundreds of thousands of dollars each year from defendants, year after year, and similar amounts of money from other employers and insurers, year after year, to do examinations and related depositions in workers compensation and other insurance cases.  On information and belief, defendants, perhaps through their workers compensation defense attorneys, communicated with each other concerning the desire of Coke and Sedgwick to obtain a report which Coke and Sedgwick could use to cut off or deny workers compensation benefits, or to defeat litigation claiming benefits, and concerning which findings Coke and Sedgwick and or their lawyers wanted in a report so as to be able to cut off or deny benefits.  Coke and Sedgwick used Dr. Drouillard dozens or scores of times in the years 2003-2008 to examine insurance claimants and write cut off reports, and used other cut off doctors.  Coke and Sedgwick made similar communications with other doctors whom

5

they wanted to write cut off reports.

14.   Once Coke and Sedgwick and other defendants and members of the enterprise obtained a report from Dr. Drouillard, or another cut off doctor, they disregarded or did not honestly and in good faith assess reports and records from a claimant's treating doctors, as required by Michigan law, but instead cut off or denied benefits, citing the cut off report.

15.   Coke, Sedgwick and other defendants misrepresented to each of the plaintiffs, through the use of the US mails, that their cut off doctors were doing "independent" medical examinations of the claimants.   Coke and Sedgwick made hundreds of such misrepresentations to claimants in the years 2003 through 2008. These representations were mailed to plaintiffs.  These representations were false, because the doctors, such as Paul Drouillard, were not independent, in that they earned tens of thousands of dollars, or hundreds of thousands of dollars, each year for many years in a row, from defendants and other employers and workers compensation insurers, doing examinations of injury claimants.  Defendants knew these doctors were not independent but were in fact financially dependent upon them and employers and insurers similarly situated.  Defendants knew these doctors would generally or almost always write a report stating a worker had no work related disability. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

16.     In each of the cases in which they terminated or denied benefits based on the report of a cut off doctor, Coke and Sedgwick and other defendants acted in bad faith and fraudulently in failing to give any consideration or due consideration to the reports and records of a claimant's treating doctors, once they had received the report of a cut off doctor, such as Dr. Drouillard.   This intentional failure to give honest and good faith consideration to the records and reports of a

6

claimant's treating doctors, and to honestly weigh those records and reports against the report of the cut off doctor, violated a duty owed by Coke and Sedgwick to the claimant under the Michigan Workers Disability Compensation Act, MCL 418.101 et seq (the Act), to be honest in the administration of a workers compensation claim.  This duty is inherent in the Act; also, MCL 418.631 specifically imposes a duty on an insurer or self-insurer not to "unreasonably fail to pay promptly claims for compensation for which it shall become liable."  This duty required defendants to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors,  and all other medical records, where the treating doctor found a work-related disability.  Defendants used the mails and wires in furtherance of this scheme, in violation of 18 U.S.C. 1341 and 1343.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

17.  Coke, Sedgwick and other defendants fraudulently violated duties owed plaintiff under the Michigan Uniform Trade Practices Act, MCL 500.2001 et seq, (MUTPA) using the mails and wires in furtherance of their scheme, in violation of 18 U.S.C. 1341 and 1343.  MUTPA applies to workers compensation insurance; see MCL 500.2008 and 500.2016.  The duties imposed on defendants in the administration of workers compensation claims by the provision of that act required defendants to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors,  and all other medical records, where the treating doctor found a work-related disability.  The provisions of that act which apply to this action are:

a. MCL 500.2006 **Timely payment of claims or interest.**   This section imposes a duty to pay "on a timely basis" to "an individual ...directly entitled to benefits

7

under its insured's contract of insurance..."  "Failure to pay claims on a timely basis... is an unfair trade practice unless the claim is reasonably in dispute."  The "reasonably in dispute" language imposed a duty on Sedgwick and Coke (as self insurer) to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors, and all other medical records, where the treating doctor found a work-related disability.  This section also provides that if benefits are not paid on a timely basis the benefits shall bear simple interest after satisfactory proof of loss was received by the insurer at the rate of 12% per annum.

b.  MCL 500.2026 **Course of Conduct.**  "[U]nfair or deceptive acts or practices in the business of insurance, other than isolated incidents, are a course of conduct indicating a persistent tendency to engage in that type of conduct and include:

"(d) Refusing to pay claims without conducting a reasonable investigation based upon the available information.

***

(f) Failing to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.

c.  MCL 500.2062 **False Reports.**  "(1) It shall be unlawful; for any person in any report required by law to be made by any insurance corporation.... to make any such statement or report as to fraudulently conceal the real facts."

The Michigan legislature intended these sections of MUTPA to apply to the administration of workers compensation claims because when the legislature wanted a section *not* to apply to

8

workers compensation, it said so; see MCL 500.2006(6).

17 A.   Defendants owed plaintiff a duty of *prompt* payment of claims not only under MUTPA, but under the Workers Disability Compensation Act.   This duty was stressed by the Michigan Supreme Court said in *McAvoy v H. B. Sherman Co.* 401 Mich 419, 258 NW2d 414 (1977):

> Any worker's compensation schema has, therefore, as its primary goal, the delivery of sustaining benefits to a disabled employee as soon as possible after an injury occurs, regardless of any traditional concepts of tort liability.   The objective of the social legislation is to provide the disabled worker with benefits *during* the period of his disability so that the workers and his dependents may survive (literally) the catastrophe which the temporary cessation of necessary income occasions..   [emphasis by the Court]

18. Dr.Drouillard and Sedgwick misrepresented to the claimants in this case, and to workers compensation claimants employed by, inter alia, DHL, that Dr. Drouillard was conducting an "independent" medical examination of the claimants.   Dr. Drouillard and Sedgwick knew this representation to be false because they intended Dr. Drouillard to write reports favoring Coke, Sedgwick and other employers and insurers; they knew he was not "independent" but biased towards the employer and insurer in that he almost always found that a claimant did not have a work-related disability and that he was paid hundreds of thousands of dollars a year by workers compensation insurers, defendants and claims administrators.

18A   Dr. Drouillard violated a duty arising under his medical licenses, oaths and standards to truly and honestly examine a claimant and to weigh the results of their examination against the reports and records they possessed from other physicians who had examined or treated the claimant.

9

Dr. Drouillard used the mails and wires in furtherance of this scheme, in violation of 18 U.S.C. 1341 and 1343.

19.    Dr. Drouillard committed fraud for Coke and Sedgwick and upon plaintiff Clifton Jackson and, on information and belief, upon other Coke employees and upon workers compensation claimants employed by other employers such as Ajax Paving, DHL and UPS, by writing dozens of reports over a period of years (1) stating he examined a claimant or a body part of a claimant when he did not; (2) stating a claimant said something to him which the claimant did not say; (3) stating a claimant failed to disclose a fact which the claimant did disclose, and or (4) stating dishonestly and without reasonable medical basis that a claimant did not have a work-related disability.    Dr. Drouillard was engaged in the business of writing such reports on behalf of MES Solutions, Medical Evaluation Specialists, and other companies which contract with physicians to do forensic medical examinations; he wrote fraudulent reports and gave fraudulent testimony on behalf of other employers, claim adjusting companies and insurers besides Coke, Sedgwick, DHL, SRS Services, Ajax Paving, UPS and Liberty Mutual ; in 2004-2008 he earned about $600,000 per year doing exams of workers compensation and other insurance claimants, writing reports of the exams, and testifying in cases arising out of those exams.

20.    A.  Defendants' fraud was also accomplished in part by the termination of benefits for stated reasons which were a  mere pretext rather than a legitimate basis for denial of benefits.


B.  Plaintiffs' damages were proximately caused by defendants' scheme of fraudulently and dishonestly denying workers compensation benefits.  Mail and electronic communications were used by defendants in furtherance of the scheme.  Defendants' use of mail and electronic communications

in furtherance of their scheme of fraud violated 18 U.S.C. 1341 and 1343.

C.    On information and belief, some of the acts of mail and wire fraud consisted of communications between defendants, or between defendants and the IME "cut off" doctors whose reports defendants relied upon in terminating or denying plaintiffs' benefits, or between defendants and their workers compensation defense attorneys; plaintiffs do not have these communications. On information and belief, Coke and Sedgwick relied on their Michigan workers compensation defense attorneys to identify "cut off: doctors - that is, doctors whom the attorneys knew could be relied upon with extreme confidence to write a report stating a claimant did not have a work-related disability, which the insurer or the claim adjuster or the defense attorneys could then cite as grounds for cutting off or denying workers compensation benefits; those attorneys communicated by mail and wire with Coke and Sedgwick the tactic of using doctors who could be relied on to write a report that would state a worker did not have a work-related disability regardless of the facts, and the attorneys gave to Coke and Sedgwick the name and contact information for such doctors, such as Dr. Paul Drouillard.  These attorneys recommended Dr. Drouillard as a cut off doctor to their other clients, such as DHL.   In their communications, Coke and Sedgwick and perhaps their attorneys discussed means - such as using cut off doctors like Dr. Drouillard - of cutting off plaintiffs' benefits or forcing them to take settlements at less than true value, even though Coke and Sedgwick and their workers compensation defense attorneys possessed medical reports from treating doctors and doctors chosen by defendants stating plaintiffs did have work-related disabilities.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

22.  Dr. Drouillard has repeatedly testified in workers compensation cases involving the

11

plaintiffs in this case and other persons that "independent medical examinations" (IMEs) and related depositions are "10 to 15% of my practice," but he knew that testimony was false because IMEs and related depositions either comprised substantially more than 10 to 15% of his earnings or substantially more than 10 to 15% of the time he spent in his practice (earning money from the practice of medicine and doing IMEs and depositions). From 2003 through 2008 he did about 1,100 examinations per year.

23. Defendants' fraudulent scheme was accomplished by use of the United States mails and by electronic communications in violation of 18 U.S.C. 1341 and 1343. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

24. Defendants Coke and Sedgwick violated 18 U.S.C. 1962(a) and (b), in that monies received from the pattern of racketeering alleged herein, in which defendants participated, were used or invested in the operation of the RICO enterprise which engaged in or affected interstate commerce and which proximately injured plaintiffs as alleged herein, or were used to maintain control of any RICO or other enterprise which engaged in or affected interstate commerce. Coke and Sedgwick are liable under the principles of respondent superior and vicarious liability. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

25. Dr. Paul Drouillard, as part of a RICO enterprise or by his association with one of the RICO enterprises alleged above, violated 18 U.S.C. 1962(c) in that he participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, and proximately injured plaintiffs as alleged herein. His illegal conduct is described in throughout this complaint. The

12

Michigan workers compensation defense attorneys, through their actions described in paragraph 20, may have participated in the conduct of the enterprise's affairs through a pattern of racketeering activity which proximately injured plaintiffs as alleged herein. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

26. Coke and Sedgwick, not as the RICO enterprise but by association with one of the RICO enterprises alleged above, violated 18 U.S.C. 1962(c) in that they participated in the conduct of a RICO enterprise's affairs through a pattern of racketeering which proximately injured plaintiffs, making Coke and Sedgwick liable to plaintiffs for damages, except where they have been released by a plaintiff. Personnel at Sedgwick, such as LaTara Lewis, violated 18 U.S.C. 1962(c) in that they participated in the conduct of a RICO enterprise's affairs through a pattern of racketeering which proximately injured plaintiffs, making Coke and Sedgwick liable to plaintiffs for damages, except where they have been released by a plaintiff. The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

27. Coke's and Sedgwick's workers compensation attorneys may have participated in the scheme by using the mails and wires to (1) identify for Coke and Sedgwick Dr. Drouillard as a physician who could be relied upon to lie for defendants and write a report stating a claimant did not have a work related disability regardless of the true facts, (2) to advise Coke and Sedgwick to defend and delay the claim despite knowledge that a claimant had presented proof of a valid workers compensation claim and that there was no reasonable ground for further defense and delay of the claim, and (3) to defend and delay the workers compensation claim despite knowledge that a

claimant had presented proof of a valid workers compensation claim and that there was no reasonable ground for further defense and delay of the claim. The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

28.   It was the policy of Sedgwick to describe the examinations by doctors hired by it as "independent medical evaluations."   These statements were false and known to Sedgwick and Coke to be false, because the examining doctors were chosen by defendants, paid by defendants, and made large sums of money doing examinations for defendants.

29.   Coke and Sedgwick are liable to plaintiffs under respondent superior and vicarious liability insofar as they have profited or benefitted from their employees' or agents' violations of 18 U.S.C. 1962(c), enterprise.

30   **Continuity.**   The racketeering described in this complaint continued over a period of many years, involved many workers compensation claimants in addition to the plaintiffs, was a regular and continuing method which defendants used to handle many workers compensation claims, and involve a systematic threat of ongoing fraud and a high risk of continuing fraud. The allegations of this paragraph are based on the allegations in all other paragraphs of this complaint, and on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery of other workers compensation claims by Coke employees and by employees of other employers, such as DHL, which were handled by Sedgwick (plaintiff's counsel is preparing a civil RICO complaint against DHL, Sedgwick and Dr. Drouillard on behalf of employees of DHL, involving allegations extremely similar to those in this complaint, which will be filed soon in this district court); allegations against Dr. Drouillard are also based on the facts

14

alleged in the complaint filed in this court, Sammy Lewis et al v UPS et al, case 09-CV-11059.

   31. **The Pattern of Racketeering and the Claims of Each Plaintiff.** The pattern of racketeering and some of the particular means of achieving this fraudulent scheme which are known to plaintiffs at this time are described below plaintiff by plaintiff (paras. A and B).  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery; for example, precise dates of mailing or faxing or emailing among defendants or their agents are known to defendants and not plaintiffs.  These allegations describe a pattern of racketeering spread over several years, continuing in the present and likely to continue into the future.   Defendants used  mail and electronic communications in furtherance of their scheme to defraud,  violating 18 USC 1341 and 1343.   With regard to each plaintiff, Coke and Sedgwick or their agents used the mails and wires at least five times in furtherance of the scheme to deprive a plaintiff of his or her workers compensation benefits: (1) mailing by Sedgwick from its Kentucky or Chicago area claims office a notice to the plaintiff to appear for an "independent medical examination" with Dr. Drouillard or another cut off doctor; (2) mailing or faxing or phoning to Dr. Drouillard in Garden City, MI, the notice that a plaintiff would appear before him for the exam; (3) mailing or faxing the doctor's report from Warren or Garden City MI to Sedgwick at its Kentucky office: (4) mailing by Sedgwick or its agent from its office in Kentucky or Chicago of the report to the plaintiff; (5) mailing or faxing by Dr. Drouillard, either from his office in Warren MI at MES or from his Garden City MI office, his report to Sedgwick in Kentucky; (6) mailing the Notice of Dispute by Sedgwick from its Kentucky or Chicago office to the Agency in Lansing MI and to the plaintiff.  The persons who engaged in the pattern of racketeering are, in addition to the named defendants, the individuals at the Sedgwick and Coke

workers compensation claims departments who handled Michigan workers compensation claims. The dates of some of these mailed, emailed or faxed communications are within the possession of defendants.

Coke's and Sedgwick's workers compensation attorneys may have participated in the scheme by using the mails and wires to (1) identify for Coke and Sedgwick Dr. Drouillard as a physician who could be relied upon to lie for defendants, and who would write a report stating a claimant did not have a work related disability regardless of the true facts, (2) to advise Coke and Sedgwick to defend and delay the claim despite knowledge that a claimant had presented proof of a valid workers compensation claim and that there was no reasonable ground for further defense and delay of the claim, and (3) to defend and delay the workers compensation claim despite knowledge that a claimant had presented proof of a valid workers compensation claim and that there was no reasonable ground for further defense and delay of the claim.  The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

### 31 A.  CLIFTON JACKSON

Clifton E. Jackson was employed by Coke when on 9/17/2007 he injured his lumbosacral spine.   He was treated thereafter by Dr. Shlomo Mandel of the Henry Ford Hospital system, a specialist in treating the low back.   Dr. Mandel determined that plaintiff has been disabled by his work-related back injury from 9/2007 to the present, and continuing.    In May 2008, Sedgwick required plaintiff to attend an "independent medical examination" by Dr. Terry Weingarden, paid for by defendants.   Dr. Weingarden opined that plaintiff was disabled by his work-related injury.  Sedgwick later had plaintiff examined again by Dr. Weingarden, and again he opined plaintiff was

16

disabled.

Despite these opinions, on Jan. 6, 2009, LaTara Lewis of Sedgwick mailed plaintiff a letter stating, "I have scheduled an Independent Medical Evaluation for you with Dr. Drouillard on Jan. 14, 2009...."  The letter was fraudulent in that Dr. Drouillard was not an "independent" doctor but was hired and paid by Segwick, not by a person or entity with no financial stake in the outcome of plaintiff's claim; in that Drouillard was paid by Sedgwick and other workers compensation insurers hundreds of thousands of dollars to examine Mr. Jackson and other workers compensation claimants; in that Dr. Drouillard participated in a scheme to fraudulently and dishonestly deprive plaintiff and, on information and belief, thousands of other workers compensation claimants of their workers compensation benefits.   Furthermore, Dr. Drouillard is not a back surgeon; he does surgeries on knees, shoulders and other joints, but not the LS spine.

Dr. Drouillard mailed wrote a report of his examination dated Jan. 14, 2009 to Sedgwick, and Sedgwick mailed or emailed a copy to plaintiff.    The report contained lies:

(1) Dr. Drouillard stated plaintiff said his pain "is not actually the right leg," which is false, because plaintiff told the doctor he did have pain down the right leg.

(2) Dr. Drouillard stated, "He tells me he gets numbness and tingling in the right buttock that occurs sometimes, but he is not sure when he last had it."  This statement was false, because plaintiff told the doctor he had had pain, numbness and tingling in the buttock the night before the exam.

(3)  Dr. Drouillard stated, "Overall, he thinks his pain is getting better."   Plaintiff never made this statement.

(4)  Dr. Drouillard stated "he [Mr. Jackson] is willing to forward flex 70 degrees,"  which statement was a lie, in that Mr. Jackson could not forward flex anywhere near 70 degrees.

17

(5)  Dr. Drouillard stated, "There are thick calluses in the palms over both hands, over the fourth metacarapal heads suggestive of ongoing manual labor despite his historical account."   This statement was a lie; plaintiff did not have calluses.

(6)  Dr. Drouillard stated he reviewed an MRI of the LS spine and said, "There is no evidence of disc herniation in my opinion."  This opinion was fraudulent; it was not within the reasonable range of medical opinion and was made as part of a scheme to assist insurers in depriving plaintiff and others of their workers compensation benefits by writing examination reports that insurers could use to cut off or deny benefits.

(7)  Dr. Drouillard stated, "I feel he can return to work unrestricted...."   This opinion was fraudulent; it was not within the reasonable range of medical opinion and was made as part of a scheme to assist insurers in depriving plaintiff and others of their workers compensation benefits by writing examination reports that insurers could use to cut off or deny benefits.

In reliance on Dr. Drouillard's report, Sedgwick cut off benefits, proximately injuring plaintiff.  Defendants' conduct caused plaintiff damages:  causing him to be deprived of workers compensation benefits, and having to pay expenses and attorney fees.

WHEREFORE, Clifton Jackson seeks judgment of treble damages jointly and severally against defendants plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

### 31 B. CHRISTOPHER SCHARNITZKE

A.   Christopher M. Scharnitzke was employed by Coke as a delivery driver.  His job involved repetitive lifting of cases of soda, and carts containing cases of soda, for up to ten hours a day.  In 2007 plaintiff developed a left shoulder injury over time, from lifting at work.  He was

disabled for a time beginning in August 2007 and returned to work in Feb. 2008.  Plaintiff did not claim workers compensation benefits for that period of disability, although he had told his doctors his problems arose over time while doing heavy lifting at work.  In 2004, 2006 and 2007, he told his family doctor, Dr. Marcia Vanderbock, that he had left shoulder pain doing heavy lifting at work.  On August 13, 2007, Dr. Marc Milia, orthopedic surgeon,, recorded, "He works at Coca Cola and does a lot of heavy pushing and pulling.  He has been having pain with overhead activity.  There is pain at night."   Dr. Milia ordered an MRI.   In 2007, the MRI reported:

IMPRESSION:

1.  There appears to be a mild tendinosis involving supraspinatus tendon; however, there is no evidence of a tendon tear.

2.   Although there is no evidence of significant degenerative change involving the acromioclavicular joint, the acromioclavicular joint is positioned in such a way there may be mild degree of impingement upon the rotator cuff.

B.  After receiving the MRI report, Dr. Milia diagnosed "acromioclavicular arthritis."  He treated plaintiff and released him for work Feb. 23, 2008.

C.  After plaintiff returned to work in Feb. 2008, he had no problems doing his job until March 4, 2008.  On that date, while at work for Coke in Detroit, MI, he was pulling a two wheeler cart, loaded with 6 cases weighing about 300 pounds, up a flight of stairs.  As he was pulling the heavy cart upstairs, he felt instant pain in left shoulder.   He was sent to the company's industrial clinic, Concentra Medical Centers, on 3/4/08.

D.  On 3/11/08, Dr. Morisetty of Concentra examined plaintiff, and took a history from him, "I was pulling produce upstairs and hurt my left shoulder."   The doctor then wrote:

19

ASSESSMENT:

1. Left shoulder pain. 719.41. **Minor work aggravation.**

2. Chronic shoulder problem.

The Concentra doctors noted in their records that plaintiff was disabled from work due to the condition of his left shoulder, and they referred him to his orthopedic surgeon, Dr. Milia.

E.   The Concentra records were sent immediately to Sedgwick.  Despite having received these records, Sedgwick mailed to the Agency and to plaintiff on March 18, 2008 a Notice of Dispute stating "medical treatment not related to injury.....IW [injured worker] has been diagnosed with acromioclavicular arthritis." **Sedgwick did not have information from which it could honestly and fairly conclude that plaintiff's disability in March 2008 was due to acromioclavicular arthritis, and was not work-related.**   Instead, it had information from Concentra stating "minor work aggravation," which was legally sufficient to qualify plaintiff for workers compensation benefits.  Furthermore, it did not have information that the acromioclavicular arthritis which preceded the work injury of March 4, 2008, was not work-related.   Sedgwick also had information that plaintiff had returned in March 2008 to his orthopedic surgeon, Dr. Milia.

F.   Since March 18, 2008, Sedgwick and Coke have repeatedly denied benefits despite having received, directly and from their attorneys, proof that plaintiff had suffered a new rotator cuff tear.  Inter alia, defendants through their mailed a CARRIER'S RESPONSE to the Agency and to plaintiff falsely denying - despite having sufficient proof to the contrary - that plaintiff was disabled and that the disability was work-related.   Even after receiving an IME report in Nov. 2008 from Dr. Michael Holda, which stated plaintiff was disabled due to a shoulder injury and did not say that the disability was not work-related, defendants continued to deny that plaintiff was disabled due to

20

a work-related condition.

On May 8, 2008, Dr. Milia wrote an office visit note stating, "MRI demonstrates posterior shoulder labral tear." This note was received by Sedgwick.

On or about July 22, 2008, Coke and Sedgwick mailed to the Agency and to plaintiff or his counsel a Carrier's Response, which denied that plaintiff was disabled; that denial was false, in that defendants possessed information that plaintiff was disabled, and no information that plaintiff was not disabled. The Response also denied that the disability was work related, and that denial was false, in that defendants had sufficient proof from plaintiff's medical records of a work related disability, and no proof the disability was not work related.

In April 2009, Coke and Sedgwick received, via their workers compensation attorney, a note written by Dr. Milia dated 3/26/09 and stating:

> I am the orthopedic surgeon who has treated Mr. Scharnitzke's left shoulder since
>
> 2007. His current shoulder disability (from March 3, 2008 to April 2009) was
>
> caused by the 13 years of repetitive heavy lifting and pulling required by Mr.
>
> Scharnitzke's job at Coca Cola, and was also caused by the injury at work on 3/3/08.

Despite receipt of this note, defendants continued to deny benefits and used the mails and wires to continue to deny benefits.

Coke's and Sedgwick's actions are part of a scheme to fraudulently deprive plaintiff of his workers compensation benefits regardless of facts, and without regard to the duties imposed on it by Michigan law, such as set forth in paras. 17 and 21, above. Defendants' conduct caused plaintiff damages: causing him to be deprived of workers compensation benefits, and having to pay expenses and attorney fees.

WHEREFORE plaintiff Christopher M. Scharnitzke seeks judgment of treble damages against defendants jointly and severally plus attorney fees and costs as provided by 18 U.S.C. 1964 and by other statutes and court rules.

32.  **PRAYER FOR INJUNCTIVE RELIEF.**  Plaintiffs seek equitable relief.  They seek an injunction (1) forbidding Dr. Drouillard from doing IMEs for Coke and Sedgwick; (2) forbidding Coke and Sedgwick from using a doctor for IMEs who in the overwhelming number of exams does not find a work-related injury; (3) requiring Coke and Sedgwick to keep detailed and public records of all deliberations and communications regarding every decision (a) to pay or deny workers compensation benefits, and (b) to select a doctor for an examination of a MI workers compensation claimant, and (4) requiring Liberty and UPS to adjust and handle claims as required by the Michigan Insurance Code and the Workers Disability Compensation Act.

WHEREFORE plaintiffs pray for judgment against defendants jointly and severally in an amount exceeding $75,000, plus interest under this act, costs and attorney fees, and injunctive relief as described above.

### REQUEST FOR CLASS CERTIFICATION

1.  The class of plaintiffs involved in this action are so numerous that joinder of all members is impracticable; on information and belief, the number exceeds fifty.

2.  A question of law and fact exists common to the class, namely whether defendants conducted or associated with a RICO enterprise with the aim of fraudulently denying MI workers compensation claimants their benefits.

3.  The claims of the plaintiffs are typical of the claims and defenses of the class.

4.  The plaintiffs and their counsel will fairly and adequately protect the interests of the

class.

5.   Prosecuting separate actions by individual class members creates a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the parties opposing the class.

6.   Coke, Sedgwick and Dr. Drouillard have acted on grounds that generally apply to the class, so that injunctive relief is appropriate respecting the class as a whole.

WHEREFORE plaintiffs pray for certification of this action as a class action.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues triable by jury.


/s/ Marhsall Lasser
Marshall Lasser PC, by
Marshall Lasser P25573
po box 2579
Southfield MI 48307
(248) 647 7722

C:\wp51\DOCS\CocaColaRICO\ComplaintRICO.wpd