UNITED STATES DISTRICT COURT

IN THE EASTERN DISTRICT OF MICHIGAN

**CLIFTON E. JACKSON and**
**CHRISTOPHER M. SCHARNITZKE,**

    Plaintiffs, on behalf of themselves and          Case No.: 2009-11529
     other persons similarly situated                   Judge David M. Lawson

**SEGWICK CLAIMS MANAGEMENT**
**SERVICES, INC, and**
**COCA COLA ENTERPRISES, INC,**
**foreign corporations, and**
**DR. PAUL DROUILLARD,**
**Jointly and Severally,**

    Defendants.
_____/
Marshall Lasser P25573
MARSHALL LASSER PC
Attorney for plaintiffs
po box 2579
Southfield MI 48037
248-647-7722
_____/

## RICO CASE STATEMENT

1. Violation of 18 U.S.C. 1962 (a, b and c).

2. The named plaintiffs and the class members are employees of Coca Cola (Coke). Sedgwick Claims Management Services (Sedgwick) with Coke adjusted the workers compensation claims of the plaintiffs and class members who were injured working for Coke. Coke and Sedgwick defrauded plaintiffs and class members of their workers compensation benefits by fraudulently denying those benefits or fraudulently cutting off those benefits. They did so by, inter alia, by denying or cutting off benefits for reasons known to be false, and or by

retaining a doctor, such as Paul Drouillard to conduct a so-called "independent medical examination" (IME) which they knew would not be independent but would be highly or completely biased toward finding no work-related disability.  That is, they knew Dr. Drouillard was a "cut off" doctor, a physician known to Michigan workers compensation attorneys and claims adjusters as a doctor who would examine a claimant and always or nearly always find no work-related disability, despite the claimants' treating surgeons finding of work-related disbility.  Coke and Sedgwick knew the report of these cut off doctors could be cited as grounds for cutting off or denying from the start a claimant's workers compensation benefits.

Coke and Sedgwick deliberately violated their duties under the Michigan Workers Disability Compensation Act, MCL 481.101 et seq,  to be honest in the administration of a workers compensation claim, and not to "unreasonably fail to pay promptly claims for compensation for which it shall become liable."  This duty required defendants to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors,  and all other medical records, where the treating doctor found a work-related disability.  Defendants used the mails and wires in furtherance of this scheme, in violation of 18 U.S.C. 1341 and 1343.  Coke, Sedgwick and other defendants fraudulently violated duties owed plaintiff under the Michigan Uniform Trade Practices Act (MUTPA), using the mails and wires in furtherance of their scheme.  The duties imposed on defendants in the administration of workers compensation claims by the provision of that act required defendants to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors,  and all other medical records, where the treating doctor found a work-related disability.  However, Sedgwick and Coke did not conduct this good faith examination; upon receipt of a report from a cut off doctor they cut off benefits.

Coke and Sedgwick also filed with the Michigan Workers Compensation Agency Notices of Dispute containing fraudulent grounds for denying or terminating benefits (the Michigan Workers Disability Compensation Act required an insurer or self insurer or claims adjusting company to file a Notice of Dispute when denying or terminating benefits.)

Coke and Sedgwick were assisted in selection of IME physicians and in the administration of Michigan workers compensation claims by their Michigan defense counsel, who knew that Dr. Drouillard and other IME doctors, such as Phillip Mayer, were "cut off" doctors. These attorneys have not been named as defendants but on information and belief they assisted Coke and Sedgwick in identifying and recommending for defendants cut off doctors such as Drouillard and Mayer, who they used in many other cases for many other clients, and whom they knew would write cut off reports.

Dr. Drouillard is a cut off doctor par excellence. He earns $600,000 or more per year doing IMEs. He always or nearly always finds no work-related disability. He finds no work-related disability far more often than any other IME doctor hired by the insurance companies. He finds no work-related disability far, far, far more often than a claimant's treating surgeon (who don't do IMEs for insurers).

In Michigan, there are scores of IME doctors regularly used by workers compensation insurers and claims adjusters; some, perhaps a dozen, are corrupt in that they lie in their reports and find no work-related disability at a rate much, much higher than that found by treating doctors or even by their fellow IME doctors. (An IME doctor who finds work-related disability too often is no longer hired by insurers and claims adjusters.)

Dr. Drouillard finds no work-related disability at a rate much higher than even his IME brethren. On information and belief, he finds no work-related in 98% of his examinations,

whereas treating physicians find disability in 100% of claimants (by definition; claimants are people who have been cut off or denied workers compensation, but do have a work-related disability according to their treating doctors). Other IME doctors find disability or work-related disability in 30-50% of claimants.

More to the point, plaintiffs will prove Dr. Drouillard lies. He lies in his reports. He lies about the examination he claims to conduct (many examinees insist he did not perform the exam his reports say he performed). He lies about what the examinee allegedly did or said during the exam (he often reports that an examinee did not disclose a prior injury, when the examinee insists he did tell the doctor about the prior injury). He lies in the bottom line of the IME - the opinion as to whether there is a work-related disability - when he finds no work-related disability.

3. On information and belief, discovery will reveal that Michigan workers compensation defense counsel assisted their clients, Coke and Sedgwick, in identifying and recommending for their clients cut off doctors such as Drouillard and Mayer. These attorneys recommended or hired Drouillard and Mayer in many other cases for other clients, for many years; they knew Drouillard and Mayer and other doctors would write cut off reports. They knew Drouillard and Mayer were dishonest, or so biased toward finding no work-related disability that their clients could not fulfill their duties under Michigan law to fairly, honestly, and in good faith decide the claims of Coke employees.

4. Jackson and Scharnitzke were injured by fraudulent denial of their workers compensation benefits. Jackson injured his low back; he was treated by Dr. Shlomo Mandel, a back specialist (who, curiously, does hundreds of IMEs each year for workers compensation insurance companies, but in this case he was Jackson's treater). Dr. Mandel told Segdwick Mr. Jackson had a work-related disability. Sedgwick sent Jackson for an IME with Drouillard who

wrote a cut off report; Sedgwick and Coke cut off benefits. The injury is the loss of benefits and the expense and time of recovering those benefits.

Scharnitzke was fraudulently denied benefits. Sedgwick and Coke denied benefits initially without grounds for doing so, and later, when they received medical reports from plaintiff's orthopedic surgeon informing them plaintiff had a work related disability, they persisted in their denial of benefits. The injury is the loss of benefits and the expense and time of recovering those benefits.

5. a-b. Alleged predicate acts and statutes allegedly violated; dates of predicate acts.

**Cliffton Jackson.** On Jan. 6, 2009, LaTara Lewis, Sedgwick claim adjuster, mailed plaintiff a letter stating, "I have scheduled an Independent Medical Evaluation for you with Dr. Drouillard on Jan. 14, 2009...." The letter was fraudulent for reasons stated in the complaint, and even if an innocent mailing it was used in furtherance of the scheme of fraudulently cutting off plaintiff's benefits.

Dr. Drouillard mailed wrote a report of his examination dated Jan. 14, 2009 to Sedgwick, and Sedgwick mailed or emailed a copy to plaintiff. The report contained lies, as described in the complaint.

Sedgwick mailed a Notice of Dispute to the Agency and to plaintiff on 1/22/09 which falsely stated "Per IME report of Dr. Drouillard, Mr. Jackson can return to full duty and has reached MMI [maximum medical improvement] status." This Notice of Dispute was false and was used in furtherance of the fraudulent scheme. These two predicate acts of mail fraud (third and fourth involving Jackson) are not alleged in the complaint; plaintiff will seek to amend the complaint to allege them.

On information and belief, discovery will reveal other mailings and electronic communications among defendants and their attorneys which are predicate acts.. These communications are not in the possession of plaintiffs.

These mailings were predicate acts of mail fraud, in violation of 18 U.S.C. 1341 and 1343. (Under case law, an innocent mailing is mail fraud if used in furtherance of a fraudulent scheme.)

In addition to the mail and wire fraud statutes violated, defendants violated 18 U.S.C. 1962(a, b and c), as described in para. 16, 17, 19 and 24-26 of the complaint.

**Chris Scharnitzke.** Sedgwick mailed to the Agency and to plaintiff on March 18, 2008 a Notice of Dispute stating "medical treatment not related to injury....." This Notice was false and used in furtherance of the fraudulent scheme. These are two predicate acts (mailing to the Agency and mailing to plaintiff).

On or about July 22, 2008, Coke and Sedgwick mailed to the Agency and to plaintiff or his counsel a Carrier's Response, which denied that plaintiff was disabled; that denial was false, in that defendants possessed information that plaintiff was disabled, and no information that plaintiff was not disabled. The Response also denied that the disability was work related, and that denial was false, in that defendants had sufficient proof from plaintiff's medical records of a work related disability, and no proof the disability was not work related. These are two additional predicate acts (mailing to Agency and to plaintiff.)

Thus plaintiff has alleged two predicate acts involving Jackson, and will amend to allege acts three and four; he has alleged four predicate acts involving Scharnitzke.

On information and belief, discovery will reveal other mailings and electronic communications among defendants and their attorneys which are predicate acts.. These

communications are not in the possession of plaintiffs.

These mailings were predicate acts of mail fraud, in violation of 18 U.S.C. 1341 and 1343. (Under case law, an innocent mailing is mail fraud if used in furtherance of a fraudulent scheme.)  By means of the mail and wire fraud, defendants violated 18 U.S.C. 1962(a, b and c), as described in para. 16, 17, 19 and 24-26 of the complaint.

5 d.  No criminal conviction.

5 e.  No judgments.

5 f and g.  Pattern and Plan:  Sedgwick and Coke regularly and continuously dishonestly cut off or terminate workers compensation benefits to Michigan injured workers employed by Coke.  On information and belief, Sedgwick has also regularly and continuously dishonestly cut off or terminated benefits for Michigan injured workers employed by DHL Holdings and other companies whose claims Sedgwick adjusts; for example, Sedgwick uses the same cut off doctors and files false Notices of Dispute in these other Michigan workers compensation cases.

Sedgwick and Coke cut off or terminate benefits in violation of their duties under Michigan law, as set forth in the complaint.  They cut off and deny for false reasons, they use cut off doctors such as Paul Drouillard, they do not honestly and fairly weigh the report of IME doctors such as Drouillard against information received from treating doctors but upon receipt of the IME report they cut off benefits.  They file fraudulent Notices of Dispute.  Dr. Drouillard lies in his reports.   He lies not only for Sedgwick and Coke, but in many cases each year involving employers such as UPS and Ajax Paving.   This is a pattern of behavior which has existed for years and will continue into the future unless stopped, and on information and belief has hurt dozens of Coke workers.

6. The enterprise. The definition of enterprise is changing; an important case is before the USSC and will be decided this term. Therefore, plaintiffs have described alternative enterprises.

(1) The workers compensation personnel at the workers compensation claims departments at Sedgwick and Coke, handling Michigan workers compensation claims and associating in fact, formed an "enterprise" for purposes of the Racketeer Influenced and Corrupt Organizations Act (RICO) claims in this case. Because they worked together regularly in adjusting and handling workers compensation claims for Coke Michigan workers, they formed an organization. The personnel at Sedgwick who handled Coke's Michigan workers compensation claims, and the Michigan defense attorneys who worked with Sedgwick on those claims, also handled Michigan workers compensation claims for other employers, such as DHL Holdings. The names of other persons in the enterprise are not known to plaintiffs. Additionally or alternatively, the following persons or entities are an "enterprise" which acted to defraud plaintiffs of their workers compensation benefits:

(2) the workers compensation claims personnel at Sedgwick who handled Michigan claims;

(3) the workers compensation claims personnel at Sedgwick who handled Michigan claims, plus Dr. Drouillard;

(4) the workers compensation claim personnel at Coke and Sedgwick handling Michigan claims, plus Dr. Paul Drouillard;

(5) the workers compensation defense attorneys may be and may have been part of the enterprise.

7. Separate.

8. The daily activities of the enterprise (Sedgiwck and Coke workers compensatsion departments) includes adjustment and administration of workers compensation claims. Some and perhaps the majority of those claims are paid properly. But a significant percentage of the claims are fraudulently denied or cut off.

9. The enterprise profits if a claimant is forced by poverty to settle his claim for less than it is worth - this happens all the time; it profits if a workers compensation magistrate accepts the testimony of Dr. Drouillard and denies benefits; it profits from holding and investing the money during the months and years between the cut off or denial of a claim and the date the claim is paid.

10. Coke and Sedgwick move money and (for Coke) product interstate.

11. Coke and Sedgwick used the money derived from the scheme to fund their businesses and to invest.

12. Coke and Sedgwick control the enterprise.

13. Workers compensation claim adjusters employed by defendant, and Dr. Drouillard, work for the enterprise. The liable persons are defendants.

14. NA

15. Plaintiffs have to pay an attorney fee and expenses to recover their benefits (both weekly wage loss benefits and medical coverage for their work-related injury). Plaintiffs lost the time value of the money which they received years after they should have received it.

16 and 17. By fraudulently cutting off or denying workers compensation benefits, defendants took money out of plaintiff's pockets - their weekly benefits. Defendants deprived plaintiffs of medical treatment for their work-related injuries.

17. The amount of the damages cannot be ascertained at this time, because plaintiffs remain disabled and wrongfully denied benefits continue to accrue.

18. NA

19. NONE

20. The undersigned attorney has filed three civil RICO cases alleging fraudulent cut off or denial of workers compensation by Michigan insurers and claims administrators, fraudulent testimony by doctors who regularly do "independent medical examinations" for those insurers and administrators. In the first case, *Brown et al v Cassens et al*, ____ F 3d ____ (6th Cir 2008, case no 05-2089, decision of 10/23/08), the Sixth Circuit recognized this cause of action. The present case is one of those three cases; in two of the cases, Dr. Paul Drouillard is a defendant.

The undersigned attorney plans to file soon a fourth RICO case involving similar allegations, against DHL Holdings, Inc and - once again - Dr. Paul Drouillard and Sedgwick. (Sedgwick CMS administered claims for DHL., as it did for Coke in this case.)

Plaintiffs' attorney is a Michigan workers compensation specialist representing injured workers. He detests the widespread use by workers compensation claims adjusters of dishonest IME doctors to cut off benefits.

Dr. Drouillard will be shown to be the king of cut off doctor s, doing about 1,100 exams per year and earning about $600,000 per year for doing so. Insurers and their lawyers select Dr. Drouillard to do IMEs because they know he will almost always write a report they can use to cut off benefits - a report finding no work related disability.

The proofs will show that Sedgwick has in DHL cases done what it did here - hire Dr. Drouillard and one or two other physicians whom who are notorious for never or extremely rarely finding work-related disability. Sedgwick and or their Michigan workers compensation defense attorneys knew these doctors would certainly or almost certainly write a report finding no work-related disability.

Among the scores of Michigan doctors performing so called "independent medical examinations" at the request of insurers, perhaps a dozen are notorious for never or very rarely finding work related disability. These physicians find no work related disability despite reports from treating surgeons who do find work related disability and who, unlike the IME doctors, do not receive three or four or six hundred thousand dollars from workers compensation insurers to do IMEs.

Cut off doctors such as Drouillard cause intense misery to thousands of Michigan workers each year, causing them to lose their workers compensation weekly check and their medical care.

These doctors and the claims adjusters who hire them defeat the goal of workers compensation legislation - to provide prompt compensation and treatment to injured workers.

The Michigan Supreme Court recognized this goal in *McAvoy v H. B. Sherman Co.* 401 Mich 419, 258 NW2d 414 (1977):

> Any worker's compensation schema has, therefore, as its primary goal, the delivery of sustaining benefits to a disabled employee as soon as possible after an injury occurs, regardless of any traditional concepts of tort liability. The objective of the social legislation is to provide the disabled worker with benefits *during* the period of his disability so that the workers and his dependents may survive (literally) the catastrophe which the temporary cessation of necessary income occasions..  [emphasis by the Court]

This schema of prompt delivery of benefits to injured workers is also defeated by a practice used by Sedgwick and many other insurers: denying benefits from the start for no legitimate reason - not even relying upon a cut off doctor. Mr. Scharnitzke claims Sedgwick did so in this case.

Michigan law does not punish fraudulent denial by insurers or fraudulent medical reports by IME doctors.   Ironically, the Notice of Dispute form created by the Michigan Workers Compensation Agency warns insurers they may be punished for fraudulent denial of benefits, but the warning is a joke  - *no provision of the Workers Disability Compensation Act punishes fraudulent denial of benefits or fraudulent IME reports.*   No claims adjuster, insurer or doctor has ever been prosecuted or sued civilly by the State of Michigan for fraudulent denial of workers compensation.

Civil RICO alone promises to compensate injured workers for fraudulent denial of their

benefits and fraudulent IME reports, and by the trebling of damages and award of attorney fees deter similar wrongful conduct.

Attached is an article from *Inside Counsel* magazine about the 2008 Sixth Circuit decision in *Brown*.

/s/ Marhsall Lasser
Marshall Lasser PC, by
Marshall Lasser P25573
po box 2579
Southfield MI 48307
(248) 647 7722

Dated: May 5, 2009


C:\wp51\DOCS\CocaColaRICO\RICOCaseStatement.wpd