# EXHIBIT A

UNITED STATES DISTRICT COURT

IN THE EASTERN DISTRICT OF MICHIGAN

**CLIFTON E. JACKSON and
CHRISTOPHER M. SCHARNITZKE,**

    Plaintiffs, on behalf of themselves and
    other persons similarly situated

Case No.: 2009-11529
Judge David M. Lawson

**SEGWICK CLAIMS MANAGEMENT
SERVICES, INC, and
COCA COLA ENTERPRISES, INC,
foreign corporations, and
DR. PAUL DROUILLARD,
Jointly and Severally,**

    Defendants.

_____/

Marshall Lasser P25573
MARSHALL LASSER PC
Attorney for plaintiffs
po box 2579
Southfield MI 48037
248-647-7722

_____/

## AMENDED RICO CASE STATEMENT

1.     State whether the alleged unlawful conduct is in violation of 18 U.S.C.

1962(a), (b), (c), and/or (d).

ANSWER:

Violation of 18 U.S.C. 1962 (a, b and c).

2.     List the defendants and state the alleged misconduct and basis of liability of

each defendant.

1

ANSWER:

The named plaintiffs and the class members are employees of Coca Cola (Coke). Sedgwick Claims Management Services (Sedgwick) with Coke adjusted the workers compensation claims of the plaintiffs and class members who were injured working for Coke. Coke and Sedgwick defrauded plaintiffs and class members of their workers compensation benefits by fraudulently denying those benefits or fraudulently cutting off those benefits. They did so by, inter alia, by denying or cutting off benefits for reasons known to be false, and or by retaining a doctor, such as Paul Drouillard to conduct a so-called "independent medical examination" (IME) which they knew would not be independent but would be highly or completely biased toward finding no work-related disability. That is, they knew Dr. Drouillard was a "cut off" doctor, a physician known to Michigan workers compensation attorneys and claims adjusters as a doctor who would examine a claimant and always or nearly always find no work-related disability, despite the claimants' treating surgeons finding of work-related disability. Coke and Sedgwick knew the report of these cut off doctors could be cited as grounds for cutting off or denying from the start a claimant's workers compensation benefits.

Coke and Sedgwick deliberately violated their duties under the Michigan Workers Disability Compensation Act, M.C.L. 481.101 et seq, to be honest in the administration of a workers compensation claim, and not to "unreasonably fail to pay promptly claims for compensation for which it shall become liable." This duty required defendants to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors, and all other medical records, where the treating doctor found a work-related disability. Defendants used the mails and wires in furtherance of this scheme, in

violation of 18 U.S.C. 1341 and 1343. Coke, Sedgwick and other defendants fraudulently violated duties owed plaintiff under the Michigan Uniform Trade Practices Act (MUTPA), using the mails and wires in furtherance of their scheme. The duties imposed on defendants in the administration of workers compensation claims by the provision of that act required defendants to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors, and all other medical records, where the treating doctor found a work-related disability. However, Sedgwick and Coke did not conduct this good faith examination; upon receipt of a report from a cut off doctor they cut off benefits.

Coke and Sedgwick also filed with the Michigan Workers Compensation Agency Notices of Dispute containing fraudulent grounds for denying or terminating benefits (the Michigan Workers Disability Compensation Act required an insurer or self insurer or claims adjusting company to file a Notice of Dispute when denying or terminating benefits.)

Coke and Sedgwick were assisted in selection of IME physicians and in the administration of Michigan workers compensation claims by their Michigan defense counsel, who knew that Dr. Drouillard and other IME doctors, such as Phillip Mayer, were "cut off" doctors. These attorneys have not been named as defendants but on information and belief they assisted Coke and Sedgwick in identifying and recommending for defendants cut off doctors such as Drouillard and Mayer, who they used in many other cases for many other clients, and whom they knew would write cut off reports.

Dr. Drouillard is a cut off doctor par excellence. He earns $600,000 or more per year doing IMEs. He always or nearly always finds no work-related disability. He finds no work-related disability far more often than any other IME doctor hired by the insurance companies.

3

He finds no work-related disability far, far, far more often than a claimant's treating surgeon (who don't do IMEs for insurers).

In Michigan, there are scores of IME doctors regularly used by workers compensation insurers and claims adjusters; some, perhaps a dozen, are corrupt in that they lie in their reports and find no work-related disability at a rate much, much higher than that found by treating doctors or even by their fellow IME doctors. (An IME doctor who finds work-related disability too often is no longer hired by insurers and claims adjusters.)

Dr. Drouillard finds no work-related disability at a rate much higher than even his IME brethren. On information and belief, he finds no work-related in 98% of his examinations, whereas treating physicians find disability in 100% of claimants (by definition; claimants are people who have been cut off or denied workers compensation, but do have a work-related disability according to their treating doctors). Other IME doctors find disability or work-related disability in 30-50% of claimants.

More to the point, plaintiffs will prove Dr. Drouillard lies. He lies in his reports. He lies about the examination he claims to conduct (many examinees insist he did not perform the exam his reports say he performed). He lies about what the examinee allegedly did or said during the exam (he often reports that an examinee did not disclose a prior injury, when the examinee insists he did tell the doctor about the prior injury). He lies in the bottom line of the IME - the opinion as to whether there is a work-related disability - when he finds no work-related disability.

3. List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.

ANSWER:

4

On information and belief, discovery will reveal that Michigan workers compensation defense counsel assisted their clients, Coke and Sedgwick, in identifying and recommending for their clients cut off doctors such as Drouillard and Mayer. These attorneys recommended or hired Drouillard and Mayer in many other cases for other clients, for many years; they knew Drouillard and Mayer and other doctors would write cut off reports. They knew Drouillard and Mayer were dishonest, or so biased toward finding no work-related disability that their clients could not fulfill their duties under Michigan law to fairly, honestly, and in good faith decide the claims of Coke employees.

4. List the alleged victims and stat how each victim was allegedly injured.

ANSWER:

Jackson and Scharnitzke were injured by fraudulent denial of their workers compensation benefits. Jackson injured his low back; he was treated by Dr. Shlomo Mandel, a back specialist (who, curiously, does hundreds of IMEs each year for workers compensation insurance companies, but in this case he was Jackson's treater). Dr. Mandel told Segwick Mr. Jackson had a work-related disability. Sedgwick sent Jackson for an IME with Drouillard who wrote a cut off report; Sedgwick and Coke cut off benefits. The injury is the loss of benefits and the expense and time of recovering those benefits.

Scharnitzke was fraudulently denied benefits. Sedgwick and Coke denied benefits initially without grounds for doing so, and later, when they received medical reports from plaintiff's orthopedic surgeon informing them plaintiff had a work related disability, they persisted in their denial of benefits. The injury is the loss of benefits and the expense and time of recovering those benefits.

5

5. Described in detail the pattern of racketeering activities or collection of unlawful debts alleged for each RICO claim. The description of the pattern of racketeering shall include the following information:

    a. List the alleged predicate acts and the specific statues that were allegedly violated;

    b. Provide the date of each predicate act, the participants in each predicate act, and a description of the facts constituting each predicate act;

    c. If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Identify the time, place and substance of the alleged misrepresentations, and the identity of persons to whelm and by whom the alleged misrepresentations were made;

    d. State whether there has been a criminal conviction for violation for violation of any predicate act;

    e. State whether civil litigation has resulted in a judgment with regard to any predicate act;

    f. Describe ow the predicate act forms a "pattern of racketeering activity;" and

    g. State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe the alleged relationship and common plan in detail.

ANSWER:

a-c. Alleged predicate acts and statutes allegedly violated; dates of predicate acts.

**Clifton Jackson.** On Jan. 6, 2009, LaTara Lewis, Sedgwick claim adjuster, mailed plaintiff a letter stating, "I have scheduled an Independent Medical Evaluation for you with Dr. Drouillard on Jan. 14, 2009...." The letter was fraudulent for reasons stated in the complaint, and even if an innocent mailing it was used in furtherance of the scheme of fraudulently cutting off plaintiff's benefits.

Dr. Drouillard mailed wrote a report of his examination dated Jan. 14, 2009 to Sedgwick, and Sedgwick mailed or emailed a copy to plaintiff. The report contained lies, as described in the complaint.

Sedgwick mailed a Notice of Dispute to the Agency and to plaintiff on 1/22/09 which falsely stated "Per IME report of Dr. Drouillard, Mr. Jackson can return to full duty and has reached MMI [maximum medical improvement] status." This Notice of Dispute was false and was used in furtherance of the fraudulent scheme. These two predicate acts of mail fraud (third and fourth involving Jackson) are not alleged in the complaint; plaintiff will seek to amend the complaint to allege them.

On information and belief, discovery will reveal other mailings and electronic communications among defendants and their attorneys which are predicate acts.. These communications are not in the possession of plaintiffs.

These mailings were predicate acts of mail fraud, in violation of 18 U.S.C. 1341 and 1343. (Under case law, an innocent mailing is mail fraud if used in furtherance of a fraudulent scheme.) In addition to the mail and wire fraud statutes violated, defendants violated 18 U.S.C. 1962(a, b and c), as described in para. 16, 17, 19 and 24-26 of the complaint.

7

**Chris Scharnitzke.** Sedgwick mailed to the Agency and to plaintiff on March 18, 2008 a Notice of Dispute stating "medical treatment not related to injury....." This Notice was false and used in furtherance of the fraudulent scheme. These are two predicate acts (mailing to the Agency and mailing to plaintiff).

On or about July 22, 2008, Coke and Sedgwick mailed to the Agency and to plaintiff or his counsel a Carrier's Response, which denied that plaintiff was disabled; that denial was false, in that defendants possessed information that plaintiff was disabled, and no information that plaintiff was not disabled. The Response also denied that the disability was work related, and that denial was false, in that defendants had sufficient proof from plaintiff's medical records of a work related disability, and no proof the disability was not work related. These are two additional predicate acts (mailing to Agency and to plaintiff.)

Thus plaintiff has alleged two predicate acts involving Jackson, and will amend to allege acts three and four; he has alleged four predicate acts involving Scharnitzke.

On information and belief, discovery will reveal other mailings and electronic communications among defendants and their attorneys which are predicate acts.. These communications are not in the possession of plaintiffs.

These mailings were predicate acts of mail fraud, in violation of 18 U.S.C. 1341 and 1343. (Under case law, an innocent mailing is mail fraud if used in furtherance of a fraudulent scheme.) By means of the mail and wire fraud, defendants violated 18 U.S.C. 1962(a, b and c), as described in para. 16, 17, 19 and 24-26 of the complaint.

d. No criminal conviction.

e. No judgments.

8

f and g. Pattern and Plan: Sedgwick and Coke regularly and continuously dishonestly cut off or terminate workers compensation benefits to Michigan injured workers employed by Coke. On information and belief, Sedgwick has also regularly and continuously dishonestly cut off or terminated benefits for Michigan injured workers employed by DHL Holdings and other companies whose claims Sedgwick adjusts; for example, Sedgwick uses the same cut off doctors and files false Notices of Dispute in these other Michigan workers compensation cases.

Sedgwick and Coke cut off or terminate benefits in violation of their duties under Michigan law, as set forth in the complaint. They cut off and deny for false reasons, they use cut off doctors such as Paul Drouillard, they do not honestly and fairly weigh the report of IME doctors such as Drouillard against information received from treating doctors but upon receipt of the IME report they cut off benefits. They file fraudulent Notices of Dispute. Dr. Drouillard lies in his reports. He lies not only for Sedgwick and Coke, but in many cases each year involving employers such as UPS and Ajax Paving. This is a pattern of behavior which has existed for years and will continue into the future unless stopped, and on information and belief has hurt dozens of Coke workers.

6. Described in detail the alleged "enterprise" for each RICO claim. A description of the enterprise shall include the following: (a) state the name of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise; (b) a description of the structure, purpose, function and course of conduct of the enterprise; (c) a statement of whether any defendants are associated with the alleged enterprise; (e) a statement of whether plaintiff is alleging that the defendants are individuals or entities separate from the alleged enterprise or that the defendants are the enterprise itself, or members of the enterprise;

9

(f) if any defendants alleged to be the enterprise itself, or members of the enterprise, an explanation of whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.

ANSWER:

The enterprise. The definition of enterprise is changing; an important case is before the USSC and will be decided this term. Therefore, plaintiffs have described alternative enterprises.

(1) The workers compensation personnel at the workers compensation claims departments at Sedgwick and Coke, handling Michigan workers compensation claims and associating in fact, formed an "enterprise" for purposes of the Racketeer Influenced and Corrupt Organizations Act (RICO) claims in this case. Because they worked together regularly in adjusting and handling workers compensation claims for Coke Michigan workers, they formed an organization. The personnel at Sedgwick who handled Coke's Michigan workers compensation claims, and the Michigan defense attorneys who worked with Sedgwick on those claims, also handled Michigan workers compensation claims for other employers, such as DHL Holdings. The names of other persons in the enterprise are not known to plaintiffs. Additionally or alternatively, the following persons or entities are an "enterprise" which acted to defraud plaintiffs of their workers compensation benefits:

(2) the workers compensation claims personnel at Sedgwick who handled Michigan claims;

(3) the workers compensation claims personnel at Sedgwick who handled Michigan claims, plus Dr. Drouillard;

(4) the workers compensation claim personnel at Coke and Sedgwick handling Michigan

10

claims, plus Dr. Paul Drouillard;

(5) the workers compensation defense attorneys may be and may have been part of the enterprise.

7.  State and describe in detail whether plaintiff is alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.

ANSWER:

Separate.

8.  Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity. Discuss how the racketeering activity defers from the usual daily activities of the enterprise, if at all.

ANSWER:

The daily activities of the enterprise (Segwick and Coke workers compensation departments) includes adjustment and administration of workers compensation claims. Some and perhaps the majority of those claims are paid properly. But a significant percentage of the claims are fraudulently denied or cut off.

9.  Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.

ANSWER:

The enterprise profits if a claimant is forced by poverty to settle his claim for less than it is worth - this happens all the time; it profits if a workers compensation magistrate accepts the testimony of Dr. Drouillard and denies benefits; it profits from holding and investing the money during the months and years between the cut off or denial of a claim and the date the claim is

11

paid.

10. Describe the effect of the activities of the enterprise on interstate or foreign commerce.

ANSWER:

Coke and Sedgwick move money and (for Coke) product interstate.

11. If the complaint alleges a violation of 18 U.S.C. 1962(a), provide the following: (a) state who received the income derived from the pattern of racketeering activity or through the collection of unlawful debt; and (b) describe the use of investment of such income.

ANSWER:

Coke and Sedgwick used the money derived from the scheme to fund their businesses and to invest.

12. If the complaint alleges a violation of 18 U.S.C. 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.

ANSWER:

Coke and Sedgwick control the enterprise.

13. If the complaint alleges a violation of 18 U.S.C. 1962(c), provide the following: (a) state who is employed by or associated with the alleged enterprise, and (b) state whether the same entity is both the liable "person" and the "enterprise" under 18 U.S.C. 1962(C).

ANSWER:

Workers compensation claim adjusters employed by defendant, and Dr. Drouillard, work

for the enterprise. The liable persons are defendants.

14. If the complaint alleges a violation of 18 U.S. C. 1962(d), described in detail the facts showing existence of the alleged conspiracy.

ANSWER:

NA

15. Describe the alleged injury to business or property.

ANSWER:

Plaintiffs have to pay an attorney fee and expenses to recover their benefits (both weekly wage loss benefits and medical coverage for their work-related injury). Plaintiffs lost the time value of the money which they received years after they should have received it.

16. Describe the direct causal relationship between the alleged injury and the violation of the 4e RICO statute.

ANSWER:

By fraudulently cutting off or denying workers compensation benefits, defendants took money out of plaintiff's pockets - their weekly benefits. Defendants deprived plaintiffs of medical treatment for their work-related injuries.

17. List the damages sustained by reason of the violation of 18 U.S.C. 1962, including the amount for which each defendant is allegedly liable.

ANSWER:

The amount of the damages cannot be ascertained at this time, because plaintiffs remain

13

disabled and wrongfully denied benefits continue to accrue.

18.     List all other federal causes of action, if any, and provide the relevant statute numbers.

ANSWER:

NA

19.     List all pendent state claims, if any.

ANSWER:

NONE

20.     Provide any additional information that you feel would be helpful to the Court in processing your RICO claims

The undersigned attorney has filed three civil RICO cases alleging fraudulent cut off or denial of workers compensation by Michigan insurers and claims administrators, fraudulent testimony by doctors who regularly do "independent medical examinations" for those insurers and administrators. In the first case, *Brown et al v Cassens et al,* ____ F 3d ____ (6th Cir 2008, case no 05-2089, decision of 10/23/08), the Sixth Circuit recognized this cause of action. The present case is one of those three cases; in two of the cases, Dr. Paul Drouillard is a defendant. The undersigned attorney plans to file soon a fourth RICO case involving similar allegations, against DHL Holdings, Inc and - once again - Dr. Paul Drouillard and Sedgwick. (Sedgwick CMS administered claims for DHL., as it did for Coke in this case.)

Plaintiffs' attorney is a Michigan workers compensation specialist representing injured workers. He detests the widespread use by workers compensation claims adjusters of dishonest IME doctors to cut off benefits.

14

Dr. Drouillard will be shown to be the king of cut off doctor s, doing about 1,100 exams per year and earning about $600,000 per year for doing so. Insurers and their lawyers select Dr. Drouillard to do IMEs because they know he will almost always write a report they can use to cut off benefits - a report finding no work related disability.

The proofs will show that Sedgwick has in DHL cases done what it did here - hire Dr. Drouillard and one or two other physicians whom who are notorious for never or extremely rarely finding work-related disability. Sedgwick and or their Michigan workers compensation defense attorneys knew these doctors would certainly or almost certainly write a report finding no work-related disability.

Among the scores of Michigan doctors performing so called "independent medical examinations" at the request of insurers, perhaps a dozen are notorious for never or very rarely finding work related disability. These physicians find no work related disability despite reports from treating surgeons who do find work related disability and who, unlike the IME doctors, do not receive three or four or six hundred thousand dollars from workers compensation insurers to do IMEs.

Cut off doctors such as Drouillard cause intense misery to thousands of Michigan workers each year, causing them to lose their workers compensation weekly check and their medical care. These doctors and the claims adjusters who hire them defeat the goal of workers compensation legislation - to provide prompt compensation and treatment to injured workers.

The Michigan Supreme Court recognized this goal in *McAvoy v H. B. Sherman Co.* 401 Mich 419, 258 NW2d 414 (1977):

> Any worker's compensation schema has, therefore, as its primary goal, the

15

> delivery of sustaining benefits to a disabled employee as soon as possible after an injury occurs, regardless of any traditional concepts of tort liability. The objective of the social legislation is to provide the disabled worker with benefits *during* the period of his disability so that the workers and his dependents may survive (literally) the catastrophe which the temporary cessation of necessary income occasions.. [emphasis by the Court]

This schema of prompt delivery of benefits to injured workers is also defeated by a practice used by Sedgwick and many other insurers: denying benefits from the start for no legitimate reason - not even relying upon a cut off doctor. Mr. Scharnitzke claims Sedgwick did so in this case.

Michigan law does not punish fraudulent denial by insurers or fraudulent medical reports by IME doctors. Ironically, the Notice of Dispute form created by the Michigan Workers Compensation Agency warns insurers they may be punished for fraudulent denial of benefits, but the warning is a joke - *no provision of the Workers Disability Compensation Act punishes fraudulent denial of benefits or fraudulent IME reports.* No claims adjuster, insurer or doctor has ever been prosecuted or sued civilly by the State of Michigan for fraudulent denial of workers compensation.

Civil RICO alone promises to compensate injured workers for fraudulent denial of their benefits and fraudulent IME reports, and by the trebling of damages and award of attorney fees deter similar wrongful conduct.

16

Attached is an article from *Inside Counsel* magazine about the 2008 Sixth Circuit decision in *Brown*.

/s/ Marshall Lasser
Marshall Lasser PC, by
Marshall Lasser P25573
po box 2579
Southfield MI 48307
(248) 647 7722

Dated: May 15, 2009

C:\wp51\DOCS\CocaColaRICO\RICOCaseStatementAMEND.wpd

17

# CIRCUITS

**6TH CIRCUIT** Kentucky, Michigan, Ohio, Tennessee

## Employers Face RICO Claims For Workers Comp Denials

FORGET GAMBLING, DRUG TRAFFICKING and prostitution.

The latest organized "crime," according to the 6th Circuit, is conspiring to defraud injured employees of their workers compensation benefits.

In the first decision of its kind, the appeals court recently stunned employment attorneys across America by holding that employers alleged to have schemed with their insurance carriers and/or physicians to wrongfully deny workers compensation benefits can now be sued for treble damages and attorneys fees under the civil fraud provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO).

Although RICO originally targeted criminal organizations such as the Mafia and Hells Angels, counsel warn that *Brown v. Cassens Transport Co.* exposes legitimate businesses to RICO litigation and intrusive discovery into their handling of workers compensation claims.

"I was frankly quite surprised," says Robert Abell, a solo employment law practitioner in Lexington, Ky. Abell suggests the ruling should "raise a flag of caution" for any self-insured employers, insurance adjusters and doctors who might appear to reflexively deny workers compensation claims.

The 6th Circuit revived the RICO civil fraud claims of six truckers. They allege that their self-insured employer, Cassens Transport Co., along with the Cassens claims adjuster and the doctor who found them ineligible for benefits, committed mail and wire fraud in a scheme to wrongfully deny them benefits under the Michigan Workers' Disability Compensation Act (WDCA).

The plaintiffs contend that the com-

### INSIDE CIRCUITS

**71 6TH CIRCUIT**
**Employers Face RICO Claims For Comp Denials**
Collaboration with insurers could lead to fraud charges

**73 1ST CIRCUIT**
**Court Upholds Drug Data Law, Dismissing Free Speech Concerns**
Prescribing history may not be sold for data-mining

**75 9TH CIRCUIT**
**California Labor Law Applicable to Visiting Employees**
Out-of-state workers are subject to strict state rules

**77 CIRCUIT ROUNDUP**
**3rd Circuit**
Reasonable Effort Halts Waiver

**4th Circuit**
Others' Experiences Impact Employee

**8th Circuit**
North Dakota Boosts Shareholder Rights

**Federal Circuit**
Bad Conduct During Suit Leads to Big Fine



PHOTOGRAPH BY SPIKE MAFFORD/GETTY

# CIRCUITS

pany deliberately selected doctors who could be relied upon to provide medical opinions supporting decisions to cut off or deny benefits. The defendants vigorously deny the allegations.

The 6th Circuit paved the way for the suit to proceed by overturning a 2005 ruling by the U.S. District Court for the Eastern District of Michigan dismissing the action for failing to state a claim for available relief. The unanimous appeals panel ruled Oct. 23 that the plaintiffs had sufficiently alleged at least 13 predicate acts involving fraudulent communications by mail and wire, and that the plaintiffs lost workers compensation benefits and incurred medical care and attorneys fees due to the defendants' alleged "pattern of racketeering activity."

### Shocking Development

Following recent U.S. Supreme Court case law, the 6th Circuit reversed its earlier stance that the Cassens truckers couldn't sue under RICO because they didn't plead that they had relied, to their detriment, on the defendants' allegedly fraudulent communications. The Supreme Court ruled last June that detrimental reliance isn't necessary under RICO.

The 6th Circuit also rejected the defense argument that federal RICO claims for workers compensation fraud are pre-empted by the WDCA. RICO does not invalidate the state law since the WDCA doesn't even address fraudulent benefit denials, the panel reasoned.

The defendants have asked the 6th Circuit to review the case *en banc*.

The judgment is a "shocking development" that has made some employers second-guess their bona fide interactions with their workers compensation carriers, says Claudia Orr, a senior attorney at Plunkett Cooney in Detroit.

Unfortunately, employers must await judicial guidance on some outstanding issues. "How much assistance and how much cooperation between the clinic, the carrier and the employers will get you in trouble?" Orr says. "Is it if you are cooperative in two cases [or] three cases? Does it depend on the kind of questioning, support and responses that you are providing to the workers comp carrier?"

The ruling "certainly has the potential for increasing litigation," suggests Orange Park, Fla., solo workers compensation attorney David McCranie.

He says one tricky question will be ascertaining the difference between fraud and a doctor's honest belief in his or her medical assessment. "Insurance companies always pick doctors who they think are likely to say that a claimant's injuries are not so bad as what some other physician might say," McCranie says. But, he adds, "I have not personally seen a situation where an insurance company picked a doctor knowing that the doctor's opinion is going to be fraudulent."

Yet Marshall Lasser, the attorney who represents the plaintiffs in *Brown*, contends there are doctors who earn six-figure incomes by frequently turning thumbs down on valid workers comp claims.

"I believe in Michigan alone there are thousands of workers over the years who have been made to suffer horribly because of the actions of insurance companies in wrongful, fraudulent termination or denial of claims, and fraudulent opinions by doctors," Lasser says.

### 'Wide-Open' Discovery

Lasser turned to RICO for a remedy because the WDCA gives no relief for fraud. He says he plans to launch similar suits against other companies, including possible class actions.

"RICO has very big sticks," Lasser notes. Because plaintiffs must prove a pattern of racketeering, RICO permits "wide-open" discovery beyond the specific claims pleaded, he maintains. And if the case goes to trial, he warns, "I am going to discover every single comp claim that ever existed in the past four years ... so it's going to open a real can of worms."

Despite such forewarnings, Abell predicts employers won't face a flood of litigation, but he does anticipate that the decision could be "significant on the outer margins of deterring repeated, extremely outrageous, abusive practices."

In any event, the case should remind human resources not to get too cozy with insurers and medical personnel.

"Routine assistance and discussion with the workers comp carrier and physician clinic about workers comp claims could land them in a lot of trouble," Orr says. "They need to be cautious about inserting themselves in the process and not routinely lending their opinions as to whether a claim is valid."

—CRISTIN SCHMITZ

## Conflicting Viewpoints

EMPLOYERS PAID $88 BILLION FOR WORKERS COMPENSATION INSURANCE in 2006—down from $89 billion in 2005, according to the National Academy of Social Insurance.

But employer costs actually rose by 3 percent outside California in 2006, the latest year for which figures are available. By contrast, costs plunged 17 percent in California after cost-cutting measures from 2003 and 2004 kicked in.

Nationwide, workers compensation payments to medical care providers and injured workers fell by 1.5 percent to $55 billion in 2006: $27 billion went to medical care providers and $28 billion replaced injured workers' wages. Removing California, which accounts for 19 percent of national benefit payments, employers paid $45 billion for workers compensation insurance.