# EXHIBIT B

IN RE:


THE FEDERAL RICO ACT & THE INJURED WORKER


YouTube video taken off the internet,

transcribed by Kelley A. Whitaker, CSR-0977

ORIGINAL

1                          -    -    -

2                          SAM GOLD:   Good evening, America.

3    I am Sam Gold.   In our quest to bring you the latest

4    news of interest to America's injured workers, we bring

5    you the story behind the story.   Not just old news off

6    WorkCompCentral.com, like the others do.

7                          A story that has been in the news of

8    recent has unusual ramifications, if successful in the

9    courts.   It's a topic that we have been proselytizing

10   about for the last five years.   The use of the Federal

11   Racketeer Influence and Corrupt Organizations Act, also

12   known as RICO, to hold employers, insurers and their

13   "Doc in the Box" physicians accountable for their

14   fraudulent acts that they perpetrate in the workers'

15   compensation process.

16                         A Federal Appeals Court has cleared

17   the way for discovery to begin in a RICO lawsuit that

18   accuses insurance administrator Crawford & Company, and

19   an Illinois trucking business of colluding with a

20   Michigan doctor to falsely deny workers workers --

21   their workers' compensation claims.

22                         After being ordered by the U.S.

23   Supreme Court to reconsider an earlier decision, the

24   U.S. 6th Circuit Court in Michigan reversed a District

25   Court's decision to dismiss a civil complaint under the

1   RICO law filed by six current and former employees of

2   Cassens Transport Company, Crawford and Company and

3   physician Dr. Saul Margules.

4                         In the conclusion of its 13-page

5   opinion, the appeals court said that it reversed the

6   dismissal of plaintiff's RICO claims because their RICO

7   claims are not preempted by State law and because

8   plaintiff's have adequately pleaded a pattern of

9   racketeering activity, despite the lack of reliance on

10  the defendants fraudulent acts and remanned to the

11  district court for further proceedings consistent with

12  this opinion.

13                        The Court affirmed the dismissal of

14  the intentional inflection of emotional distress claims

15  because the defendants alleged actions cannot meet

16  Michigan standard for outrageous conduct.  The appeals

17  court reported in June 2004 the plaintiffs filed a

18  complaint raising RICO an intentional infliction of

19  emotional distress claims against the defendants.  The

20  plaintiffs alleged that Cassens, which was self-insured

21  for the workers' compensation had contracted with

22  Crawford to serve as a claims adjuster.  They further

23  pleaded that Cassens, Crawford and Margules, as well as

24  other cutoff doctors, engaged in a pattern of

25  racketeering activity that denied the plaintiff's

1    workers' compensation claims.  The Court wrote

2    specifically the plaintiffs alleged that Cassens and

3    Crawford deliberately selected and paid unqualified

4    doctors, including Margules to give fraudulent medical

5    opinions that would support the denial of workers'

6    compensation benefits, and that defendants ignored

7    other medical evidence in denying them benefits.

8                        The plaintiffs also claim that the

9    defendants made fraudulent communications amongst

10   themselves and to the plaintiffs by mail and wire,

11   bringing them under the jurisdiction of the RICO

12   Statutes, the Court wrote.

13                       As you are probably aware, the

14   Federal RICO Statutes were designed to bring organized

15   crime activities to justice in the past.  The workers'

16   lawyer, Marshall Lasser of Southfield, Michigan said

17   his RICO action represents a new strategy in his state

18   to make employers an insurers accountable for their

19   fraudulent practices.  No recourse seems to be

20   available in state workers' compensation systems

21   anywhere, Lasser said.

22                       With us tonight by telephone is

23   Michigan attorney, Marshall Lasser, to fill us in on

24   the details of this most unusual lawsuit that might

25   just open the flood gates for America's attorneys to

1    finally get justice for their injured worker clients.

2    And conducting the interview tonight is our special

3    guest attorney, Sam Lasser, who is a California

4    criminal defense attorney.

5                        SAMUEL LASSER:  Good evening,

6    Folks.  My name is Samuel Lasser, I am an attorney here

7    in San Francisco and I practice mostly criminal defense

8    work, and I am here today.  Via telephone is Marshall

9    Lasser, an attorney from Michigan.

10                       And, Marshall, we are very glad to

11   have you here on the show.

12                       He is going to talk to us today

13   about his legal efforts to pursue justice on behalf of

14   injured workers in Michigan against insurance companies

15   who are fraudulently denying these injured workers

16   benefits.

17                       Good evening, Mr. Lasser.

18                       MARSHALL LASSER:  Good evening.

19                       SAMUEL LASSER:  Thank you, again,

20   for being on the show.

21                       I want to just get a little

22   background information about yourself and where you

23   are, who you are, and what you do, and how you have

24   gotten to this point.  Why don't you tell us what your

25   law practice is, how long you have been practicing law,

1    and what does your practice entails.

2                MARSHALL LASSER:   I graduated from

3    Harvard Law School in 1973.   In fact, I did work in San

4    Francisco for a couple of years.

5                          After that, I moved back to

6    Michigan, and I worked several years for Ford Motor

7    Company in the office as general counsel where we

8    defended product liability cases.   Then in the late

9    1970's I went out on my own, primarily representing

10   teamsters, and building tradesmen in workers'

11   compensation and product liability and general

12   negligence claims such as falls (phonetic) auto

13   accidents.   In the last -- I would say in the last

14   30 years that is what I have done, pretty much

15   exclusively.   Recently, due to the changes of law in

16   Michigan, it has been more workers' compensation than

17   personal injury, third-party cases.

18                SAMUEL LASSER:   So for the past

19   30 years or so years, you have handled primarily -- or

20   exclusively, plaintiff side, personal injury and

21   workers' compensation cases?

22                MARSHALL LASSER:   Yes, that's

23   correct.   I work only on the plaintiff's side.

24                SAMUEL LASSER:   And, through your

25   years of practice -- I just want to get a lead into

1    where we are and what we are talking about today in the

2    RICO lawsuit.

3                   But through your years of working in

4    the workers comp system you have, obviously, seen a

5    tremendous amount -- or you have seen a great deal, and

6    you understand how the system operates, and could you

7    explain to us a little, what is it about the system,

8    the Workers Compensation system that has frustrated you

9    the most throughout your years of practice?

10                  MARSHALL LASSER:  Good question,

11   Sam.

12                  I became really, really upset and

13   disgusted with the way the insurance companies cut

14   people off or deny benefits unconscionably, and I

15   believe, and this is what I am hoping to prove in my

16   RICO cases fraudulently.

17                  Injured workers don't have a

18   $100,000 or $200,000 cushion in case they are injured

19   on the job.  They live close to the edge financially,

20   most of them, and they desperately need their workers

21   comp in order to pay their rent or mortgage, to keep

22   their spouses from leaving, to buy food and, of course,

23   to pay for their injuries -- for medical care for their

24   injuries.

25                  About 10, 12 years ago I became

1   disgusted by two different elements, two different

2   things from the workers compensation system.   In

3   Michigan there is no punishment for workers'

4   compensation insurers, or the so-called IME,

5   Independent Medical Exam doctors they use.   If the

6   insurers, with the doctor, lie or commit fraud, there

7   simply is no punishment; they get away with it.

8                    So what I believe this has

9   encouraged and fostered is two types of bad things.

10  The first thing is the insurance company claim adjuster

11  cutting off benefits or denying benefits right from the

12  start using fraudulent reasons.   In Michigan they have

13  to file with the State of Michigan a document called a

14  Notice of Dispute.   They have to file that with what is

15  now called the Workers' Compensation Agency.   And in

16  the Notice of Dispute they have to state the reasons

17  why they are denying benefits and the reason can be

18  just complete bologna, complete bologna.   There is no

19  punishment for it, and that really enraged me, really

20  bittered me to see people hurting so badly by what I

21  thought was bold faced lying in a lot of cases.

22                    And then the other problem, which is

23  even bigger, probably, is the use of so-called IME,

24  Independent Medical Exam doctors, to wrongfully, in my

25  opinion, wrongfully and even fraudulently deny workers

1    comp right from the start, or to cut them off after a

2    person has been on workers comp after a period of time.

3    Those are the two problems that really got me going.

4              SAMUEL LASSER:   Now are these

5    problems that you are talking about, are these

6    something -- are these problems that have arisen in the

7    past five or ten years, or are these problems that you

8    saw from the outset of, you know, your practice, in

9    your beginning of practice?

10             MARSHALL LASSER:   I remember I

11   really got into workers comp in a heavy way in the

12   early and mid-eighties.  And I do -- I remember

13   distinctly a deposition that I took in 1993 in Flint,

14   Michigan of an orthopedic surgeon, or neurosurgeon, by

15   the name of Melvyn Wolf, and he admitted on the record

16   that in his -- he does IME's for insurance companies,

17   self-insured employers, General Motors, for example, is

18   a large self-insured employer, and he was grossing

19   $750,000 a year; this was back in 1993.  And it doesn't

20   take much to realize that there is very little overhead

21   for that type of business.  You need a secretary, maybe

22   you need an X-ray technician to take X ray, and you

23   don't have to pay medical malpractice premiums for that

24   because in Michigan, no matter what you say in your IME

25   report, you can't be sued.  So I was just stunned that

1    this doctor could make this kind of money, gross

2    $750,000, maybe netting $650,000, $675,000 back in

3    1993, from turning out thousands of these reports for

4    insurance companies to defendants.  That is when I

5    really first saw the problem, but I didn't see RICO as

6    the possible tool until much later.

7                    SAMUEL LASSER:  So as you said, it's

8    the unavailability of any remedy under State law, under

9    Michigan Law, for these injured workers who are being

10   fraudulently -- or who are fraudulently denied

11   benefits.  They really have no recourse under the State

12   law.  So where do you go from there, and how did you

13   find RICO as the avenue to pursue these claims?

14                   MARSHALL LASSER:  Today is 2008, so

15   it was somewhere around 2002, 2003, that -- and I am

16   not sure how it was that I thought of RICO as being an

17   avenue for what I believe is the fraudulent denial of

18   workers comp, but it was about that time, 2002 -

19   2003 that I brought -- 2003 was when I brought my first

20   case.  I am not sure how I realized I put two and two

21   together that this was the -- that this presented an

22   avenue.  But it was about 2003 that, I believe it was,

23   when I brought my first case that preceded, you know,

24   the one that finally won.

25                   SAMUEL LASSER:  Can you explain a

1    little bit as to why RICO, the Racketeering Influence

2    Corrupt Organization Law, why you selected that law to

3    go after the insurance companies -- and employers?

4                    MARSHALL LASSER:  No, RICO -- there

5    is a lot of reasons.

6                    You know, one of which that it

7    provides for trouble damages, it provides for attorney

8    fees.  It allows you to sue the people who commit the

9    racketeering acts, possibly the doctors, possibly the

10   claims adjusters, the companies that employ these

11   people.  It allows tremendous discovery -- very, very

12   wide open discovery.  I can -- a person can discover

13   not just -- about the discovery -- not just about the

14   acts that he has pled in his complaint but he can

15   discover all similar acts.

16                   SAMUEL LASSER:  But before -- I will

17   get into the discovery aspect of it later.

18                   How did you -- what proceedings did

19   you initiate back in 2003 or 2004?  How did you get the

20   ball rolling on this -- on these claims?

21                   MARSHALL LASSER:  The first case I

22   filed was on behalf of a single individual who was, I

23   believe, defrauded by an IME doctor and a claim

24   adjuster.

25                   That case was quickly thrown out of

1    the district court on the Rule 12(b)6, Federal District

2    Court rule 12(b)6.

3                    SAMUEL LASSER:  Basically, can you

4    explain what that means in common terms?

5                    MARSHALL LASSER:  Okay.  RICO is, of

6    course, the Racketeering Influence Corrupt Organization

7    Law passed, I think, in the late 1960's, early

8    seventies.

9                    When a plaintiff files a RICO

10   pleading, the defense attorneys scan it very carefully

11   and look for any basis to have it dismissed on the

12   pleadings before any depositions are taken or before

13   any discovery takes place.

14                    What happened in each of my three

15   cases is that the motion was filed under Rule 12(b)6,

16   which allows for dismissal for failure to state a

17   claim.  What the judge does there, he examines the

18   Complaint and determines whether the allegations are

19   sufficient under the Federal law to state a claim.

20                    SAMUEL LASSER:  And, you know, one

21   of the most difficult parts of filing this type of

22   lawsuit is making it past a defense motion to dismiss

23   the pleading, is that a fair statement?

4                    MARSHALL LASSER:  Certainly.

25                    SAMUEL LASSER:  Do you find that the

1    courts are receptive to these types of lawsuits, or do

2    you have the inkling that they want to side with the

3    defense?  Do you have any position on that?

4              MARSHALL LASSER:  In the three

5    attempts that I had here in the U.S. District Court of

6    Michigan, two cases were handled by one district judge

7    and the third by a second district judge, and in every

8    case they were dismissed on the pleadings.

9              Actually, the Judge is required to

10   dismiss on the pleadings, because I seeking to overturn

11   a precedent, a 6th Circuit precedent.  Detroit,

12   Michigan is within the United States, within the

13   jurisdiction, the United States Court of Appeals for

14   the 6th circuit, which includes Michigan, Ohio,

15   Tennessee, and Kentucky.

16             So the district judge was required,

17   in fact, to dismiss the case under this precedent.  But

18   nevertheless, the three district Judges, or two

19   district judges, handling these three cases were

20   hostile to the case; they were really, intensely

21   skeptical of the idea that a defense IME doctor could

22   be committing fraud, let alone widespread fraud, which

23   is what I do believe happens.  So there was definitely

24   hostility, I believe.  Maybe hostility is too strong of

25   a word, but real strong skepticism on the part of the

1   U.S. District Court judges.

2                    SAMUEL LASSER:   I want to talk about

3   how you got to this most recent decision on your

4   victory in the 6th Circuit Court appeals, the decision

5   that came down October 23rd of 2008, in which the Court

6   of Appeals, you know, reversed the District Court

7   decision and allowed you to proceed with your claims

8   and get to the discovery stage of litigation.

9                            Where has this case been the courts

10  to get it to this point?

11                   MARSHALL LASSER:   Okay.   This case

12  involves, the defendants are -- let me explain the

13  parties.

14                           There are six plaintiffs, six truck

15  drivers as plaintiffs, and there are three defendants.

16  The truck drivers are employed by Cassens Trucking.

17  Workers comp claims for Cassens Trucking are adjusted

18  by Crawford & Company.   And in the case for several of

19  the plaintiffs, if the person is injured on-the-job he

20  goes to -- was sent to, back at that time, to a Dr.

21  Saul Margules.   I believed that the six plaintiffs,

22  some of them were fraudulently denied workers comp on

23  the basis of false Notices of Dispute.   And a couple of

24  the cases, I believe, Dr. Saul Margules fraudulently --

25  wrote fraudulent reports, which needed to be followed

1    up by Notices of Dispute relying on those medical

2    reports.  That's what I alleged.  This is 2004, I

3    believe.

4                    Anyway, the defense, of course,

5    makes it motion under Rule 12(b)6 to dismiss for

6    failure to state a claim and the district judge grants

7    the motion on, really, about 5 or 6 different grounds.

8    Not only the ground that there was a precedent that

9    required a misrepresentation for plaintiff on which it

10   relied, but several other grounds.

11                   For example, he claimed -- you will

12   hear more about this later -- defendants claimed that

13   the case should have been preempted under something

14   called the McCarran-Ferguson reverse preemption, it's

15   a -- this is getting a little complicated, but the

16   insurance industry in the United States is basically

17   exempt from antitrust.  Amazing, isn't it?

18                   There is a law called the

19   McCarran-Ferguson Act that passed many decades ago

20   which exempts the insurance industry from antitrust,

21   and the corollary to that has been what is called the

22   McCarran-Ferguson reverse preemption, meaning that if a

23   case is brought under State law and the insurance

24   industry says:  Well, wait a second, this impacts

25   the -- excuse me, if the case is brought under the

1   Federal law, such as RICO, the insurance industry can

2   try to get that case dismissed, or the defendant can

3   try to get the case dismissed on the ground that it is

4   reverse preempted by the McCarran-Ferguson Act, which

5   gives the States sole jurisdiction over regulation of

6   insurance.

7               SAMUEL LASSER:   And so that was one

8   of the hurdles to overcome whether, in fact, your RICO

9   claim was preempted under this Federal Act, and the

10  Court of Appeals said it wasn't.

11              MARSHALL LASSER:   Correct.

12              SAMUEL LASSER:   This case, Brown v.

13  Cassens, the one that was published at the end of

14  October, it had been dismissed in the district court

15  and after that it was -- the Court of Appeals affirmed

16  that dismissal, am I correct?

17              MARSHALL LASSER:   Correct.   2 to 1.

18              SAMUEL LASSER:   And then you

19  appealed to the United States Supreme Court, and then

20  what happened after that?

21              MARSHALL LASSER:   Well, my appeal to

22  the district court -- to the Court of Appeals, I asked

23  the Court of Appeals to overturn this 1984 precedent,

24  precedent which the Court of Appeals had ruled that a

25  civil RICO claim requires a plaintiff to allege a

 1    misrepresentation made to him upon which relied.  By

 2    example, let's say I offer to sell you the Brooklyn

 3    Bridge.  You say sure, heres 10,000 bucks.  Then I skip

 4    town.  You have relied upon my misrepresentation that I

 5    owned the Brooklyn Bridge.  The old precedent from the

 6    Court of Appeals said that there had to be

 7    misrepresentation to the plaintiff upon which we

 8    relied.  My appeal to the U.S. Supreme Court and to the

 9    Court of Appeals was that, no, this is not what the

10    RICO law says.

11                    So when the first appeal to the U.S.

12    Court of Appeals was heard, I think it was 2006/2005.

13    The Court of Appeals, 2 to 1, affirmed their old

14    precedent.  I then applied for a rehearing on bank,

15    which means that you are asking all of the Judges of

16    the 6th Circuit Court to rehear it.  They refused.  I

17    filed a Petition for Certiorari, that's the name of an

18    appeal to the U.S. Supreme Court, and somebody --

19    another person somewhere in the United States on

20    another case was -- also appealed on another case two

21    weeks before me and about -- I think it was June, June

22    of this year, yes, June of this year, the U.S. Supreme

23    Court heard this other case, vacated that old precedent

24    of the 6th circuit and ruled that a plaintiff does not

25    have to allege a misrepresentation, made to have upon

1   which he relied.  Plaintiff only has to allege

2   fraudulent scheme, which the mails or the wires were

3   used to further of this scheme.

4                   So the case then went back down to

5   the United States Court of Appeals for the 6th circuit

6   for decision on the remaining issue.  The remaining

7   issue was whether or not the McCarran-Ferguson Act

8   reversed preempted my claim against the Cassens and

9   Crawford & Company.  The 6th Circuit Court said it did

10  not, that the Worker's Comp Act was not an act of

11  insurance, and et cetera, et cetera.  That decision on

12  October 23rd, last month, clears the way for me to

13  proceed full force, unless -- and here is the fly on

14  the ointment.  The Defendant on Friday -- I just

15  received yesterday, in fact, a motion for hearing on

16  bank by the defendants to try to get the entire 6th

17  circuit to reverse the decision of October 23.  I don't

18  believe that it will be reversed.  If it does, then I

19  have got real problems.  If it doesn't, then we go back

20  down for full blast discovery against defendants in

21  this case.  And then I am, frankly, going to file other

22  cases because this is a big problem, and I want to

23  attack it wherever it has occurred.

24                  SAMUEL LASSER:  I definitely want to

25  talk about that.  So as it stands right now with the

1    most recent decision from the Court of Appeals, you've

2    gotten through the first hurdle?  Essentially, the door

3    is open for your lawsuit to proceed into the discovery

4    stage?  Is that fair to say?

5                    MARSHALL LASSER:  Barring motion

6    reconsideration on bank and reversal of the opinion on

7    October 23rd, that is correct.

8                    SAMUEL LASSER:  Now let's talk about

9    what the discovery involves.

10                   You know, the discovery stages, all

11   the fact gathering that goes on in the case -- and

12   under RICO, I understand there is special discovery

13   rules that give a plaintiff a little more power, a

14   little more fact gathering power, than in a normal

15   civil suit.  Can you explain on that a little bit?

16                   MARSHALL LASSER:  Yes, there are

17   several elements where RICO is a very powerful tool.

18   One is that I will be able to discover -- I will be

19   able to investigate all workers' compensation claims

20   handled by the defendants in a relevant period.  Not

21   just the six that are -- that I have pled, because I

22   can look for what are called predicate acts or acts of

23   racketeering by the defendants that involve other

24   workers.  And they are not going to like that, but that

25   is really going to be powerful.  I may be able to cover

1   other claims, these people might become plaintiff and

2   even they don't become plaintiffs, well that's proof

3   that there is a pattern of racketeering.

4                    Second, of course, I will be able to

5   get, of course, all correspondence and e-mails among

6   the defendant's and, third, request the discovery of

7   all correspondence and e-mails between the defendants

8   and their attorneys, their workers comp attorneys, and

9   ask that court to examine what they call an in camera

10   inspection of those e-mails, correspondence, and see if

11   any of them were in furtherance of the fraud, and

12   that's a huge thing.

13                    SAMUEL LASSER:   That's one thing I

14   want to talk about.

15                    Communications between attorneys and

16   their clients are, in almost the entire legal world,

17   are privileged and the other side in a lawsuit is not

18   able to discover what their communications are and the

19   contents of their communications between the other

20   side's attorney and their client.

21                    Under RICO, as you explained it and

22   as I understand it, you are allowed to look at

23   communications between the insurance companies,

24   attorneys and the doctors, the Medical Examiner's.   Is

25   that right?

1          MARSHALL LASSER:  Well, not quite

2    like that.  The law is not Crystal clear, but there is

3    laws saying that I can request an in camera can't

4    inspection by the Court, not by me, of that email and

5    that correspondence to see if any of that was in

6    furtherance of the fraud.

7          For example, if the workers comp

8    attorneys were directing to use doctor A or doctor B,

9    or explaining to the claim adjuster what to put in the

10   false Notice of Dispute, that would certainly be

11   discoverable by the Court and that would be turned over

12   to me.

13         SAMUEL LASSER:  I want to sort of

14   switch gears and talk about, you know -- sort of tell

15   the viewers, you know, injured workers, or whoever they

16   may be watching the show.

17         What would you tell them, a working

18   individual, or someone who's injured on-the-job, how

19   would you explain to them the significance of this

20   lawsuit and what it really means to injured workers

21   around the country, not just in Michigan?

22         MARSHALL LASSER:  Well, I am not

23   sure what it means in other states, because I am not

24   sure what the laws are in other states.

25         For example, I don't know if the

1    laws of other states provide some remedy for fraudulent

2    use of IME doctors, or fraud brought by the IME

3    doctors, or fraudulent denial of workers comp by a

4    claim adjuster.

5                          Say laws provide a remedy, that is

6    certainly feasible to consider that, you know, RICO

7    would provide a remedy.  I think that this is a

8    template that could be used in nationwide if the

9    evidence is there.

10                         SAMUEL LASSER:  But, of course --

11                         MARSHALL LASSER:  But, of course,

12   what is the proof for fraud?  That raises a very

13   interesting question.  How do I prove that a doctor who

14   does 1,200 IME's a year for the insurance company is

15   committing fraud in 100, 200, or 500 of them?  That's a

16   very interesting question, which is yet to be resolved.

17                         SAMUEL LASSER:  Could you explain,

18   giving a few examples on practice of what your

19   experience is with these defense medical examining

20   doctors, and what you've heard them say in deposition

21   as far as what they do for the defense and how they are

22   retained, and how much money they earn and how biased

23   they are, in your experience?

24                         MARSHALL LASSER:  You asked a whole

25   bunch of things there.  Let me talk about money.

1                      One doctor, in particular, that is

2   overused here Southeast Michigan is an orthopedic

3   doctor whose records indicate that he makes about

4   $600,000 a year doing these IME and related

5   depositions.  Roughly a 1,100 exams a year, just for

6   this one entity that hires him.  We have an entity that

7   has a stable of these doctors.  This doctor works for

8   this one entity.  So I know this guy makes at least

9   600,000 a year.

10                      SAMUEL LASSER:  Solely from

11  performing these medical exams on behalf of the

12  insurance company?

13                      MARSHALL LASSER:  Right, and related

14  depositions.

15                      SAMUEL LASSER:  And depositions.

16                      MARSHALL LASSER:  Related

17  depositions.  Now what he has said -- my experience is

18  that this doctor has never filed a person to have a

19  work-related disability -- or with extraordinary

20  rarity, extraordinary rarity.  He will also testify --

21  excuse me, he will also testify that the job involving

22  repeated lifting, bending, twisting, kneeling,

23  squatting, climbing, heavy lifting does not aggravate

4   the pathology of arthritis of the knee, which I believe

25  is so far from medical truth that no doctor can

1    reasonably hold that opinion.

2                      In other words, it's a fraudulent

3    opinion, in my belief, because the evidence of

4    orthopedic medicine is so clear that repetitive heavy

5    lifting, bending, squatting, kneeling and climbing will

6    contribute to the enhanced progression pathology of

7    osteoarthritis of the knee, for example. The doctor

8    also -- or some doctors, I am not going to say who,

9    because I am not going to let the cat out of the bag

10   yet. They simply lie in their reports and they say I

11   palpated the patient, or I put him through a full range

12   of motion. I've had several patients tell me that, no,

13   he didn't do that, he didn't even touch me at all. He

14   didn't touch my arms. You know, 1 or 2 people may say

15   that, very skeptical, but earlier today -- this is

16   really quite interesting. Just about 5 or 6 hours ago

17   I talked to a person who was examined by this

18   particular doctor, and that person brought her

19   chiropractor into the room with her. Doctor X, who did

20   the exam didn't know the man was a chiropractor,

21   apparently he assumed he was her husband. When doctor

22   X's report came out and said that he examined this

23   person's spine. The chiropractor wrote a report saying

24   no, he didn't. I was there, I saw it, he didn't

25   examine the spine. Now that to me is just an out and

1    out fundamental lying.  And that is going to be -- I

2    think is going to help make a prima facia case,

3    that's one of the -- so in other words, you have false

4    statements in the reports.

5                          Simple things like that.  I

6    examined -- the doctor says I examined this, when he

7    didn't.  I touched this, when he didn't.  The patient

8    gave me this history and the patient said I have never

9    gave that history.  Or the doctor may say the patient

10   never disclosed a prior injury and the patient says

11   bologna, I told him about my prior injury.  Those are

12   questions of fact for a jury, but -- and I will be

13   happy to put my clients in front of a jury and line up

14   20, 30, or 40 of them all saying that Doctor X said

15   this lie, Doctor X said that lie, and here is Doctor X

16   having to rebut each lie.  That's going to make a great

17   trial.

18                          SAMUEL LASSER:  Now one of the

19   questions is, you have, you know, several clients who

20   you are representing in these lawsuits.  Do you think

21   this problem is more widespread throughout Michigan, or

22   throughout the entire country?

23                          MARSHALL LASSER:  I can't speak for

24   the entire country, but I sure as heck know it's

25   widespread through Michigan, from my experience.  For

1    example -- here's another example:

2                    On Tuesday this past week I was at

3    the deposition, by telephone, of a Dr. James Wessinger

4    of Lansing or Okemos, Michigan. As is the case with

5    too many of these doctors, he is retired from the

6    practice of medicine 11 years ago. He has not done

7    surgery in 11 years. And he admitted that his -- he

8    does -- that he earns between roughly $650,000 dollars

9    and $900,000 a year doing these IME's for the last 11

10   years off of the insurance companies. To me, that is

11   an absolute outrage that a man should be able to make

12   this kind of money, not practicing medicine, just doing

13   IME's from insurance companies. He can't be sued, he

14   can't be touched under State law, no matter what he

15   says.

16                   It is lies, but there is lots and

17   lots of retired doctors who are making $200,000 and

18   300,000, $400,000 a year in Michigan, just doing these

19   IME's for insurance companies.

20                   SAMUEL LASSER:  I have to imagine

21   that that problem is solely -- is not solely contained

22   in Michigan.  I would have to imagine that the same

23   thing goes on in California, the same things goes on in

24   Nevada, the same things goes on in every state in this

25   country that has a workers' compensation system.

1          MARSHALL LASSER:   That's probably

2     the reasonable surmise.

3          SAMUEL LASSER:   You know, one of the

4     arguments I anticipate from the defense side is how can

5     you prove that these doctors are really acting

6     fraudulently?   How can you prove it's not just a

7     reasonable difference of, you know, differing medical

8     opinion from your doctors to their doctors?

9          MARSHALL LASSER:   Excellent

10    question.   Excellent question, and something I have

11    given a lot of pondering to.

12          One method is, and I think it is

13    going to be very, very powerful, is when you have a

14    client who says Doctor X wrote in his report that I

15    palpated the back and the client says, no, he didn't,

16    he didn't touch my back.   You know, he lifted up my

17    shirt and looked at it, he didn't touch my back.   Or

18    another client says:   He denies that I told him about

19    my earlier knee injury, and that is bologna, I told him

20    about my earlier knee injury.   Those right there are

21    questions of fact, and if you can line up 20 or 30 of

22    clients who truthfully and persuasively will tell a

23    jury that Doctor X lied; that is going to call into

24    question every single IME report he wrote.

25          Now the question is, of course, can

1   they all be over turned?  I don't know.  I mean, I

2   really have got to think this through as to exactly

3   what proof is required.

4                    So one element -- one type of

5   evidence, which I think is very powerful, is that

6   client who can truthfully, persuasively tell the jury

7   that Doctor X's report contains lie -- this lie, that

8   lie, et cetera.

9                    Another way is when he gives -- is

10  to have an orthopedic doctor to look at Doctor X's

11  report, and then look at all the medical records.  Then

12  Doctor X says the person can return to work without

13  restriction.  When you have a neutral orthopedic

14  surgeon looking at all of the records and saying that's

15  unconscionable.  I mean no -- this is not a matter of

16  reasonable difference of opinion.  This is fraud.  This

17  person who is just eight weeks post arthrodesis of his

18  ankle cannot possibly return to unrestricted manual

19  labor.  It is not within a reasonable difference of

20  opinion.  That would be another grounds for saying a

21  particular medical report is fraudulent.

22                    A third ground would be to take a

23  position, as I described earlier, which is contrary to

24  medical knowledge, such as a position that some doctors

25  take and that repetitive heavy lifting, climbing,

1    twisting, bending, and squatting will not cause

2    progression of osteoarthritis when, in fact, it is

3    known that it will, certainly for the knee and other

4    joints, also.

5                    So those are just three -- oh, and

6    the fourth is the physical approach, and that will be

7    fun.

8                    One particular -- if you take these

9    doctors, the Doctor's that are making 600,000, 700000,

10   and 800,000 a year and you line up all their reports,

11   let's say 200 in a row.  If you find that 97 percent of

12   them find no work-related disability and on the other

13   side you have, let's say, 200 consecutive reports, you

14   might have 60, 80 or 90 different orthopedic physicians

15   on the other side and they all say there is a work

16   related disability, that is some further evidence that

17   Doctor X is committing fraud.  It's not merely a

18   difference of opinion, it's such an oceanic difference

19   of opinion that it is fraud.  Maybe a statistician will

20   come into play there.  I may be hiring a statistician,

21   I am not sure.  So those are four points there that I

22   am considering.

23                    SAMUEL LASSER:  When it comes to

24   proving your case and accumulating all this evidence,

25   whether it be statistics or having independent, neutral

 1   doctors review these files to make a determination on

 2   an individual case, you, yourself, will have to go out

 3   and find someone willing to help you, and someone --

 4   some doctor, who is willing to work on your behalf and

 5   help you uncover this fraud.  Now is that a problem?

 6                    MARSHALL LASSER:   Yes.   You are darn

 7   right that is a problem, because the medical

 8   profession -- there aren't many brave people in the

 9   medical profession, I have found.  They don't want to

10   stick their nose out.

11                    I am looking for orthopods who will

12   be willing to go against Doctor X, or Doctor Y or

13   Doctor Z, or at least take a look at his reports,

14   medial reports, and compare them to the medical

15   records, or the treaters medical records and give me an

16   opinion as to whether Doctor X, Y, or Z, or the

17   treaters' medical records, and give me an opinion as to

18   whether Doctor X, Y, or Z's opinions are fraudulent or

19   are so far from any reasonable medical opinion that

20   they are false.

21                    I was heartened when on Thursday

22   afternoon, two days ago, I did take the deposition of

23   an orthopedic surgeon, in my case I was the one -- the

24   person who took the deposition.  This doctor, who gets

25   zero percent of his income doing IME's, is so upset in

1  what he sees being done by these IME doctors that he

2  said he would help me in some of my cases. Now that's

3  great because this doctor -- great for my clients whose

4  problems involve the spine, because he is a spine

5  specialist. Now I need an orthopedic doctor who was

6  going to do knees and ankles.

7            SAMUEL LASSER: And are you looking

8  for -- are you contacting doctors only in Michigan?

9  Are you looking around the country? Where do you think

10  you will be able to find people to help you out?

11            MARSHALL LASSER: I am looking

12  anywhere. I am even looking for a doctor who is a PM&R

13  doctor, that's what we call physical medicine and

14  rehabilitation, also known as a physiatrists. I

15  believe they are also quite capable of testifying

16  regarding knees, medicine -- I am not -- yes, I would

17  say so. So I am looking at those two specialties,

18  anywhere I can find them.

19            SAMUEL LASSER: What response have

20  you gotten from clients? I know you work a lot with

21  union members, with teamsters, with Locals. What sort

22  of feedback have you gotten on this case?

23            MARSHALL LASSER: These people are

24  thrilled. People are actually thrilled and proud of

25  me. They know there's a lot of people hurt; badly,

1    badly hurt by these claim adjusters and their IME

2    doctors, claim adjusters.  I have got a lot of

3    atta-A-boy's.

4                    SAMUEL LASSER:  Now what would you

5    tell, and I know speak -- you go and speak with various

6    unions.  What would you tell them -- what would you

7    tell someone who believes they were fraudulently cut

8    off benefits and doesn't really know what to do?  You

9    know, they don't know if they should hire an attorney,

10   and there is no formal appeals process through in the

11   workers comp system for that.  What are these people

12   supposed to do?

13                   MARSHALL LASSER:  Well, they will

14   have an attorney for the workers comp case.  Once they

15   have been cutoff to, let's say, due to the dispute or

16   pursuant to an IME, they will pursue that.  But they

17   can contact me to see if there is a possibility of a

18   RICO case.  I certainly looked into a number of cases

19   against a number of corporations and a number of

20   doctors.

21                   SAMUEL LASSER:  What do you think,

22   you know, talking about the future here and the impact

23   of this case and the impact this case could potentially

24   have on the insurance system or, you know, more of

25   these suits in the future.  Do you have any idea where

1    it's going, or are you just taking it development by

2    development?

3                    MARSHALL LASSER:  Well, I mean,

4    defendants are going to have to pay a lot of money

5    before they get scared enough to change their

6    practices.  So, hopefully, there is going to be a lot

7    of money changing hands and then they will see that

8    they are going to have to stop using, you know, IME

9    doctors who are making 300,000, $400,000, $500,000,

10   $600,000 a year.  Maybe special legislation has to be

11   passed, a legislation has to be passed to have a number

12   of doctors who do not have financial ties to either

13   side, who will do IME's.  You have got to get rid of

14   the system where a man can make $300,000, $400,000,

15   $500,000, $600,000 a year doing IME's for insurance

16   companies, or for the Plaintiff's for that matter,

17   because of the fantastic bias it involves, and the

18   fraud it encourages.  I hope that's what the result is.

19                    SAMUEL LASSER:  Do you get the sense

20   that workers comp, you know, Judges, or magistrates in

21   Michigan, and maybe the courts at the state level also

22   are sort of apathetic to the situation?

23                    MARSHALL LASSER:  Very good

24   question.  I have been really bitterly disappointed by

25   the lack of interest the workers' compensation

1    magistrates have shown in the -- in my getting and

2    trying to put into evidence, financial records of these

3    IME doctors.  It's like they don't care about it, they

4    don't think it has any impact, which it blows my mind.

5    I mean, if a doctor is retired and he is making 300,000

6    or $500,000 dollar a year, or in the case of this Dr.

7    Wessinger, $800,000 a year, doing IME's just for

8    insurance companies, to me it completely destroys the

9    credibility of his testimony.

10                       And yet, I believe that most of the

11   magistrates here, they won't even let me discover -- or

12   my colleagues, they won't even let us discover that

13   information.  And if we discover it, they don't seem

14   to -- I've never -- never, ever seen an opinion by a

15   Magistrate or the appellate people -- here in Michigan

16   they are called the Workers Comp Appellate Commission,

17   never seen an opinion saying this doctor lacks

18   credibility because of the enormous amount of money he

19   is making doing this.  That just defies common sense,

20   and is really disappointing.

21                       SAMUEL LASSER:  Do you get the sense

22   that it's -- they turn a blind eye to it, or they don't

23   care or --

24                       MARSHALL LASSER:  That's what I am

25   saying.

1          SAMUEL LASSER:  They turn a blind

2    eye to it?

3          MARSHALL LASSER:  Yes, they don't

4    care.  They don't -- they don't care.

5          SAMUEL LASSER:  The only way to

6    bring this -- bring this system to light, the broken

7    system to light, you felt, was to pursue a RICO claim

8    in Federal Court?

9          MARSHALL LASSER:  That's the only

10   thing -- yeah, that's the only thing I have found that

11   seems to have a hope of worth of fixing the system.

12         SAMUEL LASSER:  Do you feel that the

13   insurance companies -- obviously, you know, you feel

14   that the law is on their side in Michigan and they

15   control the courts in the sense of the laws being in

16   their favor when it comes to denying benefits?

17         MARSHALL LASSER:  I wouldn't put it

18   that strongly.  I would say that the -- I don't say

19   they control the courts, I don't say that by any means.

20   But I do say that there is a serious flaw in the

21   Michigan scheme, in that there is no punishment for

22   fraud, nor any -- no punishment or deterrent for fraud,

23   and it allows the insurance companies, or any side, to

24   use doctors who are making 300,000, 400,000, 500,000

25   thousand a year doing IME's for one side.

1             SAMUEL LASSER:  Do you -- let me see

2    here.

3             Do you know what the other circuits

4    around this country has held as far as any of these

5    claims?  Has there been similar decisions in other

6    circuits?

7             MARSHALL LASSER:  Not to my

8    knowledge.

9             SAMUEL LASSER:  Not to your

10   knowledge.

11            Have any other attorneys approached

12   you about this and -- you know, from other states or

13   organizations from other states?

14            MARSHALL LASSER:  The first

15   organization was the National Organization of Injured

16   Workers.  I have also heard from a couple other

17   attorneys out of state and instate.

18            SAMUEL LASSER:  As far as you know,

19   has anyone told you, you know, I've been working on --

20   I've been thinking about bringing a suit like this in

21   the past and never knew how to go about it?  Are they

22   asking you for insight as to how to pursue it in

23   another district, another state, in another circuit?

24            MARSHALL LASSER:  I have not been

25   asked yet.

 1                        SAMUEL LASSER:  Would the -- and the

 2     Supreme Court has never decided an issue like this, as

 3     far as you know?

 4                        MARSHALL LASSER:  Well --

 5                        SAMUEL LASSER:  The United States

 6     Supreme Court has never really addressed workers'

 7     compensation denial of benefits?

 8                        MARSHALL LASSER:  Not on RICO, no it

 9     has not.

10                        SAMUEL LASSER:  In the RICO context.

11                        MARSHALL LASSER:  No.

12                        SAMUEL LASSER:  You have been doing

13     this, you know, obviously for a long time.  And why did

14     you wait?  Why do you feel that right now is the time

15     to do this, as opposed to decades ago?

16                        MARSHALL LASSER:  Well, heck.  I

17     mean, I wasn't even -- just frankly, it never occurred

18     to me until about five years ago that there was this --

19     this possibility.

20                        Also, I must say, that really it was

21     only about five or six years ago that I really became

22     outraged and this persistent -- what I see as

23     persistent fraud.  Yeah.  Yeah.  So much of it.

24                        SAMUEL LASSER:  Do your clients

25     often tell you of other cases in which that I know of

1    that --

2                      MARSHALL LASSER:  Oh, yeah.  I am

3    collecting data every day now.  I am -- I am trying to

4    find as many names, talk to as many people -- I want to

5    build as big a arsenal of what I believe are false

6    IME's and fraudulent Notices of Dispute, because the

7    more you can show, the easier it will be to prove the

8    case.

9                      SAMUEL LASSER:  And do you think

10   that this is the type of case that will ultimately end

11   up in front of a jury, or have you had negotiations

12   with the defense side in this to resolve it?

13                     MARSHALL LASSER:  I just received

14   yesterday from the counsel for Cassens and Crawford &

15   Company, the motion for hearing on bank.  If they lose

16   that, they would be, I think, idiots to fail to

17   seriously negotiate settlement, because the clock is

18   ticking on the attorney fees.  You know, they are going

19   to have to pay not only their attorney fees, whatever

20   the $300 or $400 an hour they are paying, they are

21   going to have to pay me the same amount because my time

22   is certainly worth at least that much, if not more

23   because I won and it is going to cost them a lot of

.4   money.

25                     Plus they, of course, there is the

1    risk, and this is what the defendants all around the

2    country should be concerned about.  When discovery --

3    discovery may disclose fraud, which may result in

4    indictments, because if I find fraud that is, I

5    believe, crystal clear, I'm going to hustle it over to

6    the Justice Department and perhaps under President

7    Obama, and in this economic climate, corporate fraud

8    and fraud by the doctors may, indeed, pique the

9    interest of the Justice Department.

10                   So the defendants in this case and

11   other cases, they are going to have to decide do we

12   really want to have this attorney, and maybe the judge

13   would with in camera inspections rummaging around all

14   of the claims, correspondence and phone calls and

15   emails.

16                   SAMUEL LASSER:  On that note, I want

17   to wrap it up and I want to thank you very much for

18   joining us by phone today all the way from Michigan,

19   and congratulate you on your legal victories up until

20   now, and the fight that you are doing on behalf of

21   injured workers in Michigan, and hopefully this will

22   have a nationwide effect.

23                   It's really good work, and I'm sure

24   your clients very much appreciate it, and I want to

25   commend you for that.

1                        So thank you very much for joining

2    us and i hope to talk to you soon.

3                        MARSHALL LASSER:   I just want to say

4    thank you for your thoughtful questions.   You asked a

5    lot of good questions.

6                        SAMUEL LASSER:   Thank you for your

7    thoughtful answers.

8                        MARSHALL LASSER:   Okay.   Bye.

9                        SAMUEL LASSER:   Take care.

10                        (End of broadcast)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3       STATE OF MICHIGAN        )

4                                ) SS

5       COUNTY OF ST. CLAIR      )

6

7                    I HEREBY CERTIFY that I reported

8       stenographically the foregoing proceedings and

9       testimony under oath at the time and place

10      hereinbefore set forth; that thereafter the same was

11      reduced to computer transcription under my

12      supervision; and that this is a full, true, complete

13      and correct transcription of said proceedings.

14

15

16

17      _____

18                    Kelley A. Whitaker

19                    CSR 0977

20

21

22

23

24

25