# UNITED STATES DISTRICT COURT

## IN THE EASTERN DISTRICT OF MICHIGAN

**CLIFTON E.  JACKSON and**
**CHRISTOPHER M. SCHARNITZKE,**

Case No.: 2009-11529

Judge David M. Lawson

Plaintiffs, on behalf of themselves and
other persons similarly situated

**SEDGWICK CLAIMS MANAGEMENT**
**SERVICES, INC, and COCA COLA**
**ENTERPRISES, INC, foreign corporations,**
**and DR. PAUL DROUILLARD,**
**Jointly and Severally,**

Defendants.

**PROOF OF SERVICE**

The undersigned certifies that this instrument, together with all referenced attachments was
served on all parties to this case and/or their attorneys of record at their respective addresses
as disclosed by the pleadings on __July 23, 2009__   by the following method(s):
[] U.S. Mail   [] Fax          [] Hand Delivered
[] Federal Express           [] UPS
[X] Other:   **ELECTRONICALLY EMAILED**

__/s/Delilah D. Talon__
Signature of Serve

---

MARSHALL LASSER P25573
MARSHALL LASSER PC
Attorney for plaintiffs
po box 2579
Southfield MI 48037
248-647-7722
mlasserlaw@aol.com
ddtalon@gmail.com


Thomas W. Cranmer P25252
Matthew F. Leitman P48999
Miller Canifield Paddock & Stone, P.L.C.
Attorneys for Defendant Coca-Cola
840 West Long Lake Road, Ste. 200
Troy, MI 48098
248-879-2000
cranmer@millercanfield.com
leitman@millercanfield.com

BUTZEL LONG
By:     Daniel B. Tukel P34978
        Lynn A. Sheehy P38162
        Katherine D. Goudie P62806
Attorneys for Defendant Dr. Drouillard
150 W. Jefferson, Ste. 100
Detroit, MI 48226
313-225-7000
tukel@butzel.com
sheehy@butzel.com
goudie@butzel.com


Kathleen H. Klaus P67207
Attorney for Sedgwick
28400 Northwestern Hwy., 3rd Fl
Southfield, MI 48034
248-354-4030
khk@maddinhauser.com

## PLAINTIFFS' RESPONSE TO DR. DROUILLARD'S MOTION TO DISMISS

Dr. Drouillard's motion should be dismissed for reasons stated in the brief.  Sanctions

should be granted against his counsel, for reasons stated in the brief.

**BRIEF IN SUPPORT OF  RESPONSE**

**Concise Statement of Issue Presented**

Should This Court Grant Dr. Drouillard's Motion to Dismiss for Failure to State a Claim

Upon Which Relief Can be Granted?

**Controlling Authorities**

On the standard of review: Carver v Bunch, 946 F. 2d 451, 452 (6th Cir 1991).

On the construction of the RICO statute:  *Sedima, SPRL v Imrex Co,* 473 US 479 at 491 n. 10, 105 S Ct 3275 at 3283 n. 10, 87 L Ed 2d at 360  (1985)

On the issue of witness immunity: *Buckley v Fitzsimmons,* 509 US 259, 269, 113 S Ct 2606, 125 L Ed 209 (1995), *Spurlock v Satterfield,* 167 F 3d 995 (6ht Cir 1999) and *Gregory v City of Louisville,* 444 F 3d 725 (6th Cir 2006).

On the "enterprise" element of RICO: *Boyle v United States,*  556 US ___(June 8, 2009, No 07-1309).

On abstention doctrines:  *Rouse v Daimler Chrysler Corp,* 300 F3d 711, 716 (6th Cir 2002)

On sufficiency of pleading proximate cause, damages, etc: *Brown et al Cassens, et al*, 546 F3d 347 (Sixth Cir 2008).

3

**ARGUMENT**

In conjunction with this response and brief, plaintiffs move for leave to file a Second Amended Complaint.  This brief responds to Dr. Drouillard's motion by analyzing its merits first as to the First Amended Complaint and then as to the proposed Second Amended Complaints.   It seems to this writer this procedure will save the court time, because if the court feels Dr. Drouillard has a meritorious argument with regard to the First Amended Complaint, it can turn immediately to the new allegations of the Second Amended Complaint, rather than returning weeks later when the matter is no longer fresh in the court's mind.[1]

**STATEMENT OF FACTS AND BACKGROUND**

Dr. Drouillard states Mr. Jackson's workers compensation claim "is only in the discovery stage of the proceeding."  (Brief 3).  Dr. DRouillard is wrong because *there is no discovery in workers compensation.*   There are no discovery depositions, no requests to produce, and no interrogatories (except those limited to vocational issues).   There is no discovery because a Michigan workers compensation proceeding is an administrative proceeding and not a judicial proceeding.  A Michigan workers compensation proceeding is governed by the Workers Disability Compensation Act of the Labor Code, MCL 418.101 et seq (the WDCA), whereas judicial proceedings are governed by the Michigan Court Rules and the Revised Judicature Act (MCL

---

[1]         **Housekeeping Note.**  Plaintiff filed an amended complaint correcting the misspelling of plaintiff Jackson, changing Cliff to Clifton.   This amended complaint was titled "Complaint," not "First Amended Complaint," but the court clerk told plaintiffs' counsel the court considers this amended complaint to be a First Amended Complaint.   Therefore, the First Amended Complaint referred to in this motion means the "Complaint" captioned "Clifton Jackson."

600.101 et seq).

Dr. Drouillard makes arguments concerning the motives of plaintiffs' counsel. Ad personam arguments are improper. They are also so clearly irrelevant to a Rule 12(b)(6) motion to dismiss that they are intended to vex or harass. For these reasons, these improper arguments should be sanctioned under Rule 11(b)(1 and 2).

Moreover, Dr. Drouillard misrepresents plaintiffs' counsel's motives. He claims counsel's "true motivation" is that counsel wants to harm *him* - but he cites in support this quote: "Plaintiff's attorney.... detests the widespread use by workers compensation claims adjusters of *dishonest IME doctors* to cut off benefits". (Brief 4,5, emphasis supplied)   This quote does not name Dr. Drouillard. Nevertheless, Dr. Drouillard has admitted he is a dishonest IME doctor, by saying this statement applies to him.

Dr. Drouillard's brief goes on for page after page (13-15) attacking plaintiffs' counsel's motive. This clearly irrelevant and vexatious argument should be sanctioned.

Defendant's footnote 4 claims that plaintiffs will have to prove "that the wrong *decision* was or will be made...... by the Worker's Disability Compensation Magistrate, and in the appellate process by the Appellate Commission, the Michigan Court of Appeals and/or the Michigan Supreme Court." (Emphasis supplied)   This is not true.   The vast majority of claims - 90% - are settled *before* an administrative hearing, so that no "decision" was or will be made by the magistrate, the Appellate Commission, etc.

Plaintiffs' counsel, unlike defendant's counsel, is a specialist in Michigan workers compensation practice, and he states from personal experience that 90% of cases are settled before an administrative hearing.   In that 10% of cases which do go to trial, roughly half - 5% of all cases -

5

involve a critical difference of opinion between an "independent medical examiner" and a plaintiff's treater; the other 5% will turn on an issue having nothing to do with the opinion of the IME; they will turn on issues such as whether the injury was within the course and scope of employment, or whether the plaintiff was an independent contractor, or whether plaintiff's misconduct bars his claim, and so on.

### Standard of Review

The moving party in a motion brought under rule 12(b)(6) has a difficult burden.  It must persuade the court "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Carver v Bunch,* 946 F. 2d 451, 452 (6th Cir 1991).   At the pleading stage of this RICO case, Dr. Drouillard must convince this court that "no set of facts" which plaintiffs might present would prove a RICO violation and injury.

When considering a motion to dismiss, a court must construe the complaint in the light most favorable to plaintiff and accept well-pleaded facts as true. *Columbia Natural Resources Inc v Tatu,* 58 F 3d 1101, 1109 (6th Cir 1995).   Thus a court may not grant a Rule 12(b)(6) motion based upon its disbelief of a complaint's factual allegations.

The RICO Act is to be constructed liberally, in favor of plaintiffs, to effectuate its remedial intent.

> In a portion of the statute that remains uncodified, Congress directed that RICO "shall be liberally interpreted to effectuate its remedial purposes."  Section 401(a) of Pub. L. No 91-452, 84 Stat. 947, 18 USC 1961 note.
>
> *Civil Rico,* by Smith and Reed, Lexis-Nexis, para. Section 1.02, page 1-8.

Liberal construction shall be applied with special vigor to section 1964 of RICO, which

6

provides for the civil remedy sought by this suit: "... if Congress' liberal-construction mandate is to be applied anywhere, it is in §1964, where RICO's remedial purposes are most evident."   *Sedima, SPRL v Imrex Co,* 473 US 479 at 491 n. 10, 105 S Ct 3275 at 3283 n. 10, 87 L Ed 2d at 360  (1985)

## I.  THE WITNESS IMMUNITY DOCTRINE DOES NOT APPLY.

### 1.   An Expert Witness Who Prepares a Report Is Not Entitled to Absolute Immunity

Defense counsel cites as authority for his argument that he is entitled to complete immunity under the Witness Immunity Doctrine argument various cases involving "judicial proceedings." *Briscoe v LaHue*, 460 US 325 (1983) held that a police officer was absolutely immune for his testimony in a criminal trial; the court held that a witness is immune from suit for his *testimony in a "judicial proceeding."   Kahn v Burman* 673 F. Supp 10 (1987 Ed MI) also involved the judicial process.   *Kahn* extended the Witness Immunity Doctrine to a doctor's report made in preparation for a medical malpractice lawsuit, holding the report was integral to a "judicial proceeding." *Maiden v Rozwood,* 461 Mich 109, 133, 597 NW2d 817 (1999), cited by defendant, also involved judicial proceedings.

*Briscoe, Kahn, Maiden* and the other cases cited by Dr. Drouillard are inapplicable for several reason.  Each of these reasons - independently- make the Witness Immunity Doctrine inapplicable here.

First and foremost, the cases are not good law.  They have long since been superseded.

The Supreme Court and the Sixth Circuit long ago held that an expert witness is not entitled to absolute immunity for a report he has prepared.  *Buckley v Fitzsimmons,* 509 US 259, 269, 113 S Ct 2606, 125 L Ed 209 (1995), *Spurlock v Satterfield,* 167 F 3d 995 (6th Cir 1999) and *Gregory*

*v City of Louisville,* 444 F 3d 725 (6th Cir 2006).   Dr. Drouillard's complete failure to discuss any of these cases is astonishing.  Dr. Drouillard was supposedly acting as an investigator (independent examiner) and therefore under *Buckley* and *Spurlock* he is not entitled to absolute immunity.

*Gregory* denied absolute immunity to a forensic expert who allegedly lied in her report concerning a rape suspect.  The court resoundingly held that the hair expert, Katz, was subject to 42 USC §1983 liability for her allegedly fraudulent report, and for trial testimony based on that report: "Subsequent testimony can not insulate previous fabrications of evidence merely because the testimony relies on that fabricated evidence."  *Gregory,* 444 F3d 67,68.

*Gregory* also denied expert Katz's claim of qualified immunity, holding that fraud in the preparation of an expert report or in testimony based on that report is not entitled to the protection of qualified immunity.  Id, at 92-94.

The court need not address plaintiffs' further arguments.  *Buckley, Spurling* and *Gregory* require this court to reject Dr. Drouillard's claim of immunity in the face of allegations that he lied in his reports.

Nonetheless, there are additional reasons to reject Dr. Drouillard's claim of any sort of immunity.  A second reason is that the cases cited by Dr. Drouillard apply to *judicial proceedings,* whereas Dr. Drouillard wrote his IME reports or gave his testimony while claims were pending before an *administrative agency,* the Workers Compensation Agency.  A third reason is that  many and perhaps the majority of Dr. Drouillard's reports were made *when no case was pending before the Agency and none was even planned*.

## 2.   A Michigan Worker's Compensation Proceeding Is Not a Judicial Proceeding

A hearing before the Worker's Compensation Agency is not a judicial proceeding because:

(1)  Workers compensation magistrates work in the department of labor (see section 213(1) of the WDCA, MCL 418.213(1).

(2)  The Michigan Court Rules do not apply; they apply only to *courts.*   MCR 1.103 provides that "the Michigan Court Rules govern practice and procedure in all *courts* established by the constitution and laws of Michigan."

(3)  A workers compensation hearing is not a creature of the sections of the Michigan constitution dealing with the judiciary, nor is it a creature of the Judicial Code of the Michigan Compiled Laws, which governs judicial proceedings (the Revised Judicature Act of 1961, MCL 600.101 et seq).  Workers compensation hearings are a creature of the Michigan Workers Disability Compensation Act, which appears in the Labor Code, at MCL 418.101 et seq.

(4)  The Michigan Rules of Evidence do not apply to a workers compensation administrative proceeding; the MRE 101 says the rules apply to "proceedings in the *courts* of this state...." A rule of evidence may be held by a court to apply to a workers compensation hearing, but -

> "[t]he court of appeals has held that the Michigan rules of evidence, which are applied in courts of general jurisdiction, do not strictly apply in worker's compensation proceedings.  See, eg, *Holford GMC,* 116 Mich App 488, 323 NW2d 454 (1982), *Rentz v GMC,* 70 Mich App 249, 245 NW2d 705."
>
> *Worker's Compensation in Michigan,* Welch and Royal, ICLE, section 17.36

Because a worker's compensation proceeding is not a judicial proceeding, *Briscoe, Kahn,* and the Witness Immunity Doctrine do not apply.

9

### 3.  The Witness Immunity Doctrine Does Not Apply Where No Proceeding Is Pending or Planned.

Even if the Witness Immunity Doctrine applied to witnesses in an administrative proceeding, it would not apply to reports made where no proceeding was pending or planned.   Many and perhaps most of Dr. Drouillard's reports in this case were not made during or in preparation for workers compensation hearing; *they were made before a hearing was even planned, and for a different purpose.*

These reports were made pursuant to a section of the WDCA which empowers workers compensation insurers to compel the examination of a workers compensation claimant even where no litigation exists or is planned, so that the insurer can determine whether it is obligated to pay benefits (the insurer is obligated to pay benefits only if work-related disability exists) .   A large percentage and perhaps the majority of workers compensation IMEs are set up not by the insurer or its lawyer for litigation existing or planned, but by a claim adjuster to determine whether he or she should pay benefits, before any litigation exists or is planned.

WDCA (MCL 418.385) gives an insurer the right to compel a workers compensation claimant to submit to an IME, upon penalty of suspension of benefits if the claimant refuses the examination or obstructs it.   The statute also compels the doctor to produce a report.

> Section 385.  After the employee has given notice of the injury and from time to time thereafter during the continuance of his disability, if so requested by the employer or the carrier, he or shall shall submit himself or herself to an examination by a physician or surgeon.  If an examination relative to the injury is made, the employee or his or her attorney shall be furnished, within 15 days of a request, a complete and correct copy of the report of every such physical examination.... If he or she refuses to submit himself or herself for the examination, or in any way obstructs the same, his or her right to compensation shall be suspended....

Even if the Witness Immunity Doctrine applies to administrative proceedings in workers

10

compensation cases, it is inapplicable to the allegation in this case made by Clifton Jackson that Dr. Drouillard lied in the report he made *before* Mr. Jackson filed his Application for Mediation or Hearing with the Workers Compensation Agency - *before* any litigation was planned.  A claim adjuster ordered the IME she could decide whether to cut off Mr. Jackson's benefits.

In Michigan, upon receipt of an IME, the claim adjuster may issue a Notice of Dispute (Workers Compensation Agency form 107), and immediately terminate or deny wage loss payments and medical care for the injury.  Administrative Rule 3, R 408.33, provides:

> Rule 3 (1) On or before the fourteenth day after the employer has notice or knowledge of an alleged injury, a carrier... shall notify the bureau [now agency] on form 107, if the right of the injured or dependent to compensation is dispute..... A copy of from 107, notice of dispute, shall be mailed or given to the injured employee.

Mr. Jackson alleged in paragraph 31A of the First Amended Complaint that Sedgwick's claim adjuster sent him to Dr. Drouillard while Sedgwick was paying benefits to him; upon receipt of Dr. Drouillard's reports, Sedgwick cut off benefits and mailed a Notice of Dispute citing Dr. Drouillard's reports as grounds for the termination of wage loss and medical benefits, exhibit A to this brief.  *Sedgwick cut off benefits before an administrative hearing was planned, filed or pending.*

A Michigan workers compensation IME report may have *immediate and drastic financial consequences* - loss of weekly wage benefits and medical care for the injury - but in the judicial setting of a malpractice action, the IME report has no immediate legal and financial effect on a litigant or prospective litigant, because before the expert's report results in a denial or award of money in a malpractice case, the expert is subject to cross examination and discovery, and a judge or jury must rule on the truth of the expert's testimony.

In the Michigan workers compensation arena, by contrast, a claim adjuster may rely upon

11

the IME to deny or cut off benefits before an administrative proceeding exists or is planned, or and before a claimant has an opportunity to conduct discovery, cross examine the expert, and have a magistrate rule on the accuracy and truthfulness of the IME. Thus an IME report in the Michigan workers compensation system plays a very different role from an IME in the arena of medical malpractice judicial proceedings.

### 4. The Witness Immunity Doctrine Does Not and Should Not Apply to a Civil RICO Action Alleging A Large-Scale Scheme to Defraud Workers Compensation Claimants

The Witness Immunity Doctrine should not apply here because of society's interest in stopping a "pattern of racketeering." Simply put, the Doctrine (if it would otherwise apply) still should not apply to a defendant in a RICO case accused of a pattern of racketeering.

This case presents a circumstance different from that in *Kahn*. *Kahn* involved a single act of alleged fraud; this case involves an alleged *pattern* of fraud in violation of RICO.

The alleged actions of Dr. Drouillard are vastly different in character and number from the expert witness's alleged actions in *Kahn*. In that case, Dr. Burman gave an opinion in *one* pending medical malpractice case. Here, *Dr. Drouillard is alleged to conspire on a vast scale to defraud dozens and perhaps hundreds of injured workers of their workers compensation benefits.*

The affidavit of Lisa Fraser, exhibit B, shows Dr. Drouillard did more than a 1,000 IMEs in each of the years, 2004, 2005 and 2006; he still does IMEs and has done them for over ten years - he has issued more than 10,000 IME reports. As noted above, Dr. Drouillard has performed *scores* of IMEs of UPS workers compensation claimants. Most were done when no administrative hearing was pending or planned.

12

In other civil RICO actions plaintiff's counsel has filed with this court and will continue to file, Dr. Drouillard is and will be accused of defrauding hundreds or even thousands of injured workers by writing false IMEs, known as "cut off" reports. Plaintiffs' counsel has already filed suit in this court against UPS, Liberty Mutual and Dr. Drouillard (case no. 2:09-cv-11059-RHC), with the same allegations as this case - a self-insured and its claim adjusters defrauded Michigan workers compensation claimants of their benefits through, inter alia, false IMEs. Plaintiffs' counsel is preparing suit against DHL and Dr. Drouillard, with similar allegations.

The scale of fraud alleged here, with a pattern of racketeering allegdly involving hundreds of claims rather than the single incident in *Kahn*, *plus the criminalization of that fraud pattern by RICO* make the Witness Immunity Doctrine inapplicable.

The problem of an IME doctor allegedly committing massive fraud doing hundreds or thousands of examinations for workers compensation insurers is not the imagination of plaintiffs' counsel. The problem was addressed by a recent *New York Times* article which appeared on the front page, exhibit C (April 1, 2009).

This lengthy work of investigative journalism reveals the seriousness of this issue in New York state. Publicly, on the front page of the *New York Times*, Hershel Sanders, an IME doctor for insurers, *admits he repeatedly committed fraud and perjury in writing IME reports for insurers:*

> "If you did a truly pure report," he said later in an interview, "you'd be out on your ears and the insurers wouldn't pay for it. *You have to give them what they want, or you're in Florida.* That's the game, baby." [emphasis supplied]

Dr. Drouillard is allegedly the Michigan equivalent of Dr. Sanders: a physician who repeatedly lies for workers compensation insurers. The workers compensation "game" in Michigan

as in New York generates massive fraud by some of the doctors doing IMEs for insurers (and probably by some of the doctors doing IMEs for plaintiffs).   This fraud has the same result in New York state as in Michigan: *the insurer uses an IME report to immediately terminate benefits.*

Given that workers compensation litigation in Michigan is an administrative and not a judicial proceeding, that most of Dr. Drouillard's reports were made not for an existing or planned administrative proceeding but were requested by a claim adjuster to determine whether to pay or cut off benefits, that RICO criminalized this pattern of racketeering, that Congress has mandated that RICO should be liberally construed to effect its mandate, and that *Sedima* said that §1964 especially should be liberally construed, the witness immunity doctrine should be rejected.


## II.  PLAINTIFFS PLEADED A CAUSE OF ACTION AGAINST DR DROUILLARD

### A(1).   Plaintiff's First Amended Complaint Plead a RICO "Enterprise."

Astonishingly, Dr. Drouillard does not discuss the most important recent authority on the "enterprise" element of RICO - *Boyle v United States,*  556 US ___(June 8, 2009, No 07-1309). *Boyle* was decided by the Supreme Court before Dr. Drouillard filed his brief, yet he omits it from his brief.

*Boyle* makes clear that plaintiffs pleaded a RICO enterprise.

The court in *Boyle* emphasized that a RICO enterprise need have no existence whatsoever outside its purpose of committing a pattern of predicate acts, and very, very little structure.  The court upheld this jury instruction:

The court also approved this instruction regarding the definition of enterprise:

The term 'enterprise' as used in these instructions may also include a gorup

14

of people associated in fact, even though this association is not recognized as a legal entity. Indeed, an enterprise need not have a name. Thus, an enterprise need not be a form[al] business entity such as a corporation, but may be merely an informal association of individuals. A group or association of people can be an 'enterprise' if, among other requirements, these individuals 'associate' together for a purpose of engaging in a course of conduct. Common sense suggests that the existence of an association in fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure.

Moreover, you may find an enterprise where an association of individuals, *without structural hierarchy,* forms solely for the purpose of carrying out a pattern of racketeering acts. Such an association of persons may be established by evidence showing an ongoing organization, formal or informal, and... by evidence that the people making up the association functioned as a continuing unit. Therefore, in order to establish the existence of such an enterprise, the government must prove that: (1) There is an ongoing organization with some sort of framework formal or informal, for carrying out its objectives, and (2) the various members and associates of the association function as a continuing unit to achieve a common purpose.

Regarding 'organization,' it is not necessary that the enterprise hae any particular or formal structure, but it must have sufficient organization that its members functioned and operated in a coordinated manner in order to carry out the alleged common purpose or purposes of the enterprise. [Emphasis by the Supreme Court] *Boyle,* slip op 3, fn 1.

15

The First Amended Complaint pleads several association in fact enterprises, two of which are alleged to included Dr. Drouillard and others which do not include him but with which he is alleged to associate:

(1) The workers compensation personnel at the workers compensation claims departments at Sedgwick and Coke, handling Michigan workers compensation claims and associating in fact, formed an "enterprise" for purposes of the Racketeer Influenced and Corrupt Organizations Act (RICO) claims in this case.   These persons included, inter alia, La Tara Lewis.  Because they worked together regularly in adjusting and handling workers compensation claims for Coke Michigan workers, they formed an organization.  The personnel at Sedgwick who handled Coke's Michigan workers compensation claims, and the Michigan defense attorneys who worked with Sedgwick on those claims, also handled Michigan workers compensation claims for other employers, such as DHL Holdings.   The names of other persons in the enterprise are not known to plaintiffs.   Additionally or alternatively, the following persons or entities are an "enterprise" which acted to defraud plaintiffs of their workers compensation benefits:

(2) the workers compensation claims personnel at Sedgwick who handled Michigan claims;

(3) the workers compensation claims personnel at Sedgwick who handled Michigan claims, plus Dr. Drouillard;

(4) the workers compensation claim personnel at Coke and Sedgwick handling Michigan claims, plus Dr. Paul Drouillard..

16

Plaintiffs thus pleaded several association in fact enterprises. By pleading "additional" enterprises, plaintiffs have plead that *two* enterprises might be operating at the same time. For example, one enterprise may consist of the Michigan workers compensation claims adjusters at Sedgwick, and a second may consist of the those adjusters plus Dr. Drouillard. The first enterprise involves those claims, such as Chris Scharnitzke's, where the fraudulent scheme did not involve an IME report, while the second enterprise involved a fraudulent Dr. Drouillard IME.

Because Dr. Drouillard's motion is brought under Rule 12(b)(6), and this is a civil RICO case, his burden on this motion is quite high. He must persuade the court "*beyond doubt* that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief." *Carver v Bunch,* 946 F. 2d 451, 452 (6th Cir 1991).

Moreover, the RICO Act is to be constructed liberally, in favor of plaintiffs, to effectuate its remedial intent. Liberal construction shall be applied with special vigor to section 1964 of RICO, which provides for the civil remedy sought by this suit: "... if Congress' liberal-construction mandate is to be applied anywhere, it is in §1964, where RICO's remedial purposes are most evident." *Sedima, supra.* 473 US 479 at 491 n. 10, 105 S Ct 3275 at 3283 n. 10, 87 L Ed 2d at 360 (1985).

Applying *Boyle,* in particular footnote 1, the First Amended Complaint has alleged facts showing that Dr. Drouillard is either a member or an associate of an enterprise that is ongoing, has a framework formal or informal, and functions as a continuing unit to achieve a common purpose. See paragraphs 9, 10, 12 and 13 of the First Amended Complaint.

Applying the standard set forth in *Boyle*, supra, The First Amended Complaint pleads sufficient facts so that this court cannot conclude "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Carver, supra.*

17

**A(2)    The Second Amended Complaint Pleads a RICO "Enterprise"**

The Second Amended Complaint adds enterprise allegations which further rebut the argument that the First Amended Complaint failed to allege an enterprise.  The added material is **boldfaced:**

> 9.    The Enterprise or Enterprises.  The allegations in this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.  **The predicate acts and violations of RICO alleged herein were committed by one or more of the following enterprises.  Dr. Drouillard participated in the conduct and management of the RICO enterprise of Dr. Paul Drouillard, and or participated in the conduct of one of the following enterprises, and or conspired with an enterprise in violation of 18 USC 1962(d).**
>
> (1) **[Renumbered in Second Amended Complaint]**  The workers compensation personnel at the workers compensation claims departments at Sedgwick and Coke, handling Michigan workers compensation claims and associating in fact, formed an "enterprise" for purposes of the Racketeer Influenced and Corrupt Organizations Act (RICO) claims in this case.   These persons included, inter alia, La Tara Lewis.  Because they worked together regularly in adjusting and handling workers compensation claims for Coke Michigan workers, they formed an organization.  The personnel at Sedgwick who handled Coke's Michigan workers compensation claims, and the Michigan defense attorneys who worked with Sedgwick on those claims, also handled Michigan workers compensation claims for other employers, such as DHL

18

Holdings.   The names of other persons in the enterprise are not known to plaintiffs. Additionally or alternatively, the following persons or entities are an "enterprise" which acted to defraud plaintiffs of their workers compensation benefits:

(2) the workers compensation claims personnel at Sedgwick who handled Michigan claims;

(3) the workers compensation claims personnel at Sedgwick who handled Michigan claims, plus Dr. Drouillard, **associating in fact**;

(4) the workers compensation claim personnel at Coke and Sedgwick handling Michigan claims, plus Dr. Paul Drouillard, **associating in fact;**

**(5) the medical business and practice of Dr. Paul Drouillard, which treats patients and which also generates what Dr. Drouillard fraudulently call "independent medical examinations;' for years Dr. Drouillard, by means of this enterprise, has supplied hundreds or thousands of fraudulent IME reports to Coca Cola, Sedgwick, UPS, Liberty Mutual, Ajax Paving, and to other Michigan employers and workers compensation insurers.**

(6) **[renumbered in Second Amended complaint]** the workers compensation defense attorneys may be and may have been part of the enterprise.

This is more than enough.   Under *Boyle,* the Second Amended Complaint survives Dr. Drouillard's attack on plaintiffs' enterprise allegations.

**B.      Plaintiffs Plead in the First Amended Complaint that Dr. Drouillard's Conduct Is Connected to the Operation of the Enterprise.**

Dr. Drouillard cites *Reves v Ernst & Young,* 507 US 170, 185 (1993), which held that a

19

RICO defendant sued under 18 USC 1964(c) must have had an "operational or management" role in the enterprise, and "participated in the conduct of the '*enterprise's affairs*,' not just their *own* affairs."   *Id* at 185 (emphasis in the original).   Plaintiffs in the First Amended Complaint have pleaded that Dr. Drouillard had an "operational" role and participated year after year after year in the "conduct of the enterprise's affairs":

> 18.   Dr.Drouillard... misrepresented to the claimants in this case, and to workers compensation claimants employed by, inter alia, DHL, that Dr. Drouillard was conducting an "independent" medical examination of the claimants.   Dr. Drouillard and Sedgwick knew this representation to be false because they intended Dr. Drouillard to write reports favoring Coke, Sedgwick and other employers and insurers; they knew he was not "independent" but biased towards the employer and insurer in that he almost always found that a claimant did not have a work-related disability and that he was paid hundreds of thousands of dollars a year by workers compensation insurers, defendants and claims administrators.
>
> ***
>
> 19.   Dr. Drouillard committed fraud for Coke and Sedgwick and upon plaintiff Clifton Jackson and, on information and belief, upon other Coke employees and upon workers compensation claimants employed by other employers such as Ajax Paving, DHL and UPS, by writing dozens of reports over a period of years (1) stating he examined a claimant or a body part of a claimant when he did not; (2) stating a claimant said something to him which the claimant did not say; (3) stating a claimant failed to disclose a fact which the claimant did disclose, and or (4) stating

20

dishonestly and without reasonable medical basis that a claimant did not have a work-related disability.  Dr. Drouillard was engaged in the business of writing such reports on behalf of MES Solutions, Medical Evaluation Specialists, and other companies which contract with physicians to do forensic medical examinations; he wrote fraudulent reports and gave fraudulent testimony on behalf of other employers, claim adjusting companies and insurers besides Coke, Sedgwick, DHL, SRS Services, Ajax Paving, UPS and Liberty Mutual ; in 2004-2008 he earned about $600,000 per year doing  exams of workers compensation and other insurance claimants, writing reports of the exams, and testifying in cases arising out of those exams.

***

25.  Dr. Paul Drouillard, as part of a RICO enterprise or by his association with one of the RICO enterprises alleged above, violated 18 U.S.C. 1962(c) in that he participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, and proximately injured plaintiffs as alleged herein.    His illegal conduct is described in throughout this complaint.

***

31 A.  CLIFTON JACKSON

[paragraphs omitted]

Despite these opinions, on Jan. 6, 2009, LaTara Lewis of Sedgwick mailed plaintiff a letter stating, "I have scheduled an Independent Medical Evaluation for you with Dr. Drouillard on Jan. 14, 2009...."  The letter was fraudulent in that Dr.

21

Drouillard was not an "independent" doctor but was hired and paid by Segwick, not by a person or entity with no financial stake in the outcome of plaintiff's claim; in that Drouillard was paid by Sedgwick and other workers compensation insurers hundreds of thousands of dollars to examine Mr. Jackson and other workers compensation claimants; in that Dr. Drouillard participated in a scheme to fraudulently and dishonestly deprive plaintiff and, on information and belief, thousands of other workers compensation claimants of their workers compensation benefits.   Furthermore, Dr. Drouillard is not a back surgeon; he does surgeries on knees, shoulders and other joints, but not the LS spine.

Dr. Drouillard mailed wrote a report of his examination dated Jan. 14, 2009 to Sedgwick, and Sedgwick mailed or emailed a copy to plaintiff.    The report contained lies:

[(1-5) omitted]

(6)   Dr. Drouillard stated he reviewed an MRI of the LS spine and said, "There is no evidence of disc herniation in my opinion."  This opinion was fraudulent; it was not within the reasonable range of medical opinion and was made as part of a scheme to assist insurers in depriving plaintiff and others of their workers compensation benefits by writing examination reports that insurers could use to cut off or deny benefits.

(7)  Dr. Drouillard stated, "I feel he can return to work unrestricted...."  This opinion was fraudulent; it ... was made as part of a scheme to assist insurers in depriving plaintiff and others of their workers compensation benefits by

22

writing examination reports that insurers could use to cut off or deny benefits.

In reliance on Dr. Drouillard's report, Sedgwick cut off benefits, proximately injuring plaintiff. Defendants' conduct caused plaintiff damages: causing him to be deprived of workers compensation benefits, and having to pay expenses and attorney fees.

Thus in the First Amended Complaint Dr. Drouillard is alleged to have been a year after year participant in the fraudulent scheme. *In fact, he is alleged to be a key player.* He is alleged to have supplied Sedgwick and many other workers compensation insurers and adjusters with many fraudulent reports, while knowing from his years of IME experience that Sedgwick and the others would rely on them to cut off or deny benefits to injured workers.

These allegations suffice under *Reves* and the cases interpreting *Reves.* Those cases hold that a defendant's participation in the "core activities" of the fraudulent scheme constitute the "participation" and "operational role" required by *Reves. Handeen v Lemaire,* 112 F. 3d 1339, 1349 (8th Cir 1997), (attorneys liable where the firm played some active "'role in the conception, creation or execution' of the illegal scheme, for then the lawyers could be said to have assumed at least *some* part in directing the enterprise's affairs." 112 F 3d at 1350-1351, quoting *Azrielli v Cohen Law Office,* 21 F. 3d 512, 521 (2d Cir 1994) and *Reves*, 507 US at 179); *Napoli v United States,* 32 F3d 31, 36 (2d Cir 1994), cert denied 513 US 1110 (1995) (attorneys who were 'of counsel' to the Esien firm were not merely providing peripheral advice but participated in the core activities that constituted the affairs of the firm, namely trying cases and obtaining settlements; they therefore exercised a significant degree of direction over the affairs of the enterprise); *Liberty Mut*

23

*Ins Co v Diamante,* 138 F Supp 2d 47, 58-61 (attorney could be found to have conducted the affairs of the defrauded insurance companies *by submitting false medical reports*; attorney "exerted control" over companies by causing them to do something they would not have otherwise done, ie, pay false claims).

See especially *Tribune Co v Purcigliotti,* 869 F. Supp. 1076, 1097 (SDNY 1994), affirmed sub nom *Tribune Co v Abiola,* 66 F. 3d 12 (2d Cir 1995), where a doctor, who aided a massive scheme to file false workman's compensation claims by falsely certifying audiograms he performed, was held to have participated in the core activities of the enterprise.

Other courts have held *Reves* does not apply where the enterprise is an association in fact enterprise, rather than the corporate enterprise involved in *Reves.* Dr. Drouillard is alleged to have been a member or associate of one or more association in fact enterprises (Sedgwick's workers compensation department, that department and Dr. Drouillard, etc). *Civil Rico,* by Smith & Reed, LexisNexis, section 5.04[3][a], pages 5-41 to 43, discusses a great number of these cases, which include *MCM Partners v Andrews-Bartlett & Assocs,* 62 F3d 967, 978 (7th Cir 1995) (plaintiff's allegation that enterprise is an association in fact with both defendants alleged as members makes it difficult to characterize them as "outsiders" under *Reves;* moreover, they were vital to achievement of the enterprise's primary goal); *Aetna Cas. Sur. Co. V P&B Autobody,* 3 F 3d 1546, 1559 (lst Cir 1994) (jury could find that autobody shop exerted some control over Aetna - the enterprise - by causing corrupt Aetna appraisers to approve false claims, thereby directing some aspect of the enterprise's affairs).

The First Amended Complaint alleges Dr. Drouillard was a key gear in one or more association in fact enterprises; these allegations suffice to defeat his rule 12(b)(6) motion.

24

C.      **The Second Amended Complaint Further Alleges that Dr. Drouillard's Conduct Is Connected to the Operation of the Enterprise.**

The proposed Second Amended Complaint adds allegations connecting Dr. Drouillard to the "operation or management" of an enterprise.  These new allegations must be taken as true for a rule 12(b)(6) motion to dismiss.   Any one of the following additions to the complaint will do ( there are three):

First, the Second Amended Complaint alleges Dr. Drouillard's medical business to be an enterprise, which he conducts and controls.  Paragraph 9 alleges various enterprises, including:

> **(5) the medical business and practice of Dr. Paul Drouillard, which treats patients and which also generates what Dr. Drouillard fraudulently call "independent medical examinations;' for years Dr. Drouillard, by means of this enterprise, has supplied hundreds or thousands of fraudulent IME reports to Coca Cola, Sedgwick, UPS, Liberty Mutual, Ajax Paving, and to other Michigan employers and workers compensation insurers.**

Second, the Second Amended Complaint adds to paragraph 9 (concerning enterprises):

> **Dr. Drouillard participated in the conduct and management of the RICO enterprise of Dr. Paul Drouillard, and or participated in the conduct of one of the following enterprises, and or conspired with an enterprise in violation of 18 USC 1962(d).**

Third, paragraph 30A of the Second Amended Complaint alleges Dr. Drouillard is liable under 18 USC 1962(d) for participating in a conspiracy to violate 18 USC 1962 (a through c).  *Reves* does not apply to conspiracy allegations.  *Reves* applies only to allegations brought under 18 USC

25

1962(c).  See, eg, *Madanes v Madanes,* 981 F Supp 241, 256 (SDNY 1997) (section 1962(c) count against attorney dismissed on *Reves* grounds, but not section 1962(d) count).

### C(1).   Plaintiffs Pleaded Two Predicate Acts Against Dr. Drouillard in the First Amended Complaint

Liability under RICO section 18 USC 1962(c) does not require that each defendant have personally committed two predicate acts.  It suffices that he aided and abetted the commission of predicate acts committed by others.

> We note that no defendant can be liable under RICO unless he participated in two or more predicate offenses sufficient to constitute a pattern. This participation need not be direct.   RICO recognizes liability for those who merely aid and abet the underlying predicate offenses. *Petro-Tech, Inc v Western Co. Of North America,* 824 F2d 1349, 1356 (3d Cir 1987).  Moreover, a defendant can be liable under RICO's conspiracy provision for agreeing to the commission of a pattern of racketeering activity, even if that defendant does not directly participate in the underlying acts. *United States v Adams,* 759 F. 2d 1099, 1116 (3d Cir), cert denied, 474 US 906, 971, 106 S Ct 275, 336, 88 L. Ed 2d 236, 321 (1985); see also *Shearin v E.F. Hutton Group, Inc,* 885 F. 2d 1162, 1166 (3d Cir 1989)(RICO conspiracy require "agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity.")
>
> *Banks v Wolk,* 918 F. 2d 418 (3d Cir 1990)

The First Amended Complaint alleges that Dr. Drouillard personally committed one predicate act (the mailing of his report on Clifton Jackson dated Jan. 14, 2009, to Sedgwick) and

26

aided and abetted another predicate act (the mailing by Sedgwick on Jan. 6, 2009 of a letter to Clifton Jackson directing him to appear at Dr. Drouillard's office for an examination - Dr. Drouillard must have agreed to examine Jackson before Sedgwick could mail a letter to plaintiff directing Jackson to appear for that exam, and therefor Dr. Drouillard aided and abetted the mailing of Sedgwick's letter, which was his second act of mail fraud):

Plaintiffs also alleged Dr. Drouillard committed other predicate acts, in addition to the two arising out of the IME examination of Mr. Jackson:

19.   Dr. Drouillard committed fraud for Coke and Sedgwick and upon plaintiff Clifton Jackson and, on information and belief, upon other Coke employees and upon workers compensation claimants employed by other employers such as Ajax Paving, DHL and UPS, by writing dozens of reports over a period of years (1) stating he examined a claimant or a body part of a claimant when he did not; (2) stating a claimant said something to him which the claimant did not say; (3) stating a claimant failed to disclose a fact which the claimant did disclose, and or (4) stating dishonestly and without reasonable medical basis that a claimant did not have a work-related disability.  Dr. Drouillard was engaged in the business of writing such reports on behalf of MES Solutions, Medical Evaluation Specialists, and other companies which contract with physicians to do forensic medical examinations; he wrote fraudulent reports and gave fraudulent testimony on behalf of other employers, claim adjusting companies and insurers besides Coke, Sedgwick, DHL, SRS Services, Ajax Paving, UPS and Liberty Mutual ; in 2004-2008 he earned about $600,000 per year doing  exams of workers compensation and other insurance

27

claimants, writing reports of the exams, and testifying in cases arising out of those exams.

These allegations are sufficient to withstand a Rule 12(b)(6) motion to dismiss the First Amended Complaint for failure to allege sufficient predicate acts.

### C(2).  Plaintiffs Pleaded A Dozen Predicate Acts by Dr. Drouillard in the Proposed Second Amended Complaint

The proposed Second Amended Complaint:

(1)  adds in paragraph 31C the complaint of Paul Lulek, who alleges multiple predicate acts by Dr. Drouillard;

(2) adds in paragraph 31 other predicate acts committed by Dr. Drouillard, and

(3) adds in paragraph 30A a claim of conspiracy in violation of 18 USC 1962(d), rendering Dr. Drouillard liable for all predicate acts committed by co-conspirators (*Banks*, supra).

Also, the Second Amended Complaint specifically alleges in paragraph 32 that Dr. Drouillard aided and abetted the predicate acts comitted by Sedgwick and Coke (and vice versa). These aiding and abetting allegations add the predicate acts committed by the other defendants to the count of predicate acts committed by Dr. Drouillard.  *Banks,* supra.

Dr. Drouillard's Rule 12(b)(6) motion to dismiss on the ground that plaintiffs failed to allege sufficient predicate acts committed by him or which he aided and abetted must be rejected because sufficient acts were plead in the First Amended Complaint, and many more in the proposed Second Amended Complaint.

## V.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE DOCTRINES OF

## PRIMARY JURISDICTION AND *BURFORD* ABSTENTION

Dr. Drouillard relies on *Rouse v Daimler Chrysler Corp,* 300 F3d 711, 716 (6th Cir 2002) in support of his claim that the *Burford* abstention doctrine bars prosecution of this case.    Curiously, that case *reversed* Judge Borman for dismissing a case under the *Burford* abstention doctrine.

*Rouse* noted that the *Burford* abstention doctrine - and any abstention claim - is applied with great reluctance by a federal court:

> Since abstention is an "extraordinary and narrow exception to the duty of a district court to adjudicate a controversy properly before it," "[o]nly the clearest of justifications" will warrant abstention.  See Colorado River Water Conservation Dist. v United States, 424 US 800, 813, 96 S Ct 1236, 1244, 47 L Ed 2d 483 (1976).

*Rouse,* 715

*Rouse* said:

> The *Burford* abstention doctrine should not be applied unless: (1) a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or (2) the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."   See *Colorado River Water Conservation Dist. v United States,* 424 US 800, 814, 96 S Ct 1236, 47 L Ed 2d 483 (1976) (discussing *Burford*).

*Rouse,* 716

The doctrine requires the involvement of "difficult questions of state law."   Dr. Drouillard cites no difficult question of state law.

The doctrine requires not only a difficult question of state law but also a demonstration that federal review of that question would be disruptive of state efforts to establish a coherent policy with respect to matters of substantial public concern.   Dr.  Drouillard does not make the required demonstration.

29

For either of these two reasons, the *Burford* abstention doctrine does not apply.

Moreover, the Sixth Circuit's reasoning in *Brown*, supra, applies here to knock out the *Burford* abstention doctrine, 546 F3d 347 (Sixth Cir 2008).   No abstention doctrine - either *Burford* or primary jurisdiction - would apply given the grounds *Brown* gave for rejecting defendants' request for McCarran Ferguson Act reverse preemption: a RICO suit does not invalidate, impair or supersede the operation of Michigan's WDCA.    A RICO suit would not "frustrate any declared state policy or interfere with a state's administrative regime."

*Brown* said:

> ...we note that RICO is also saved from reverse preemption under the McCarran-Ferguson Act because RICO would not 'invalidate, impair or impede' the WDCA.  RICO would not invlidate or supersede the WDCA because RICO would not "render [the WDCA] ineffective" given that those subject to these laws can comply with both simultaneously.  *See Humana*, 525 US at 307, 119 Sc. Ct. 710. ("The term 'invalidate' ordinarily means 'to render ineffective, generally without providing a replacement rule or law[,]' [a]nd the term 'supersede' ordinarily means 'to displace (and thus render ineffective) while providing a substitute rule.).  The question remains whether RICO would "impair" the WDCA.  In construing the term "impair," the Supreme Court explained that "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application."  *Id*, at 310, 119 S Ct 710.
>
> ...Moreover, the federal interest in protecting individuals against a pattern of racketeering activity based on fraud is "perfectly compatible" with the state interest in providing a certain remedy for employees who have suffered workplace injuries. *Id*, at 311, 119 S Ct 710.

With this reasoning, it is clear that neither *Burford* nor the primary jurisdiction doctrine nor any other abstention doctrine applies here.

It is worth noting that the State of Michigan had not filed an amicus brief at any time in the fie years *Brown v Cassens* has been pending in the federal system for 5 years.    Significantly, the State declined to file a brief in support of the *Brown* defendants' just-filed petition for certiorari for

review of their claim that the McCarran-Ferguson Act reverse preempted the plaintiffs' RICO suit. The court may contact the Supreme Court clerk to verify no filing was made by the State of Michigan in case no 05-1375.

The State was the dog that did not bark. The State's failure to bark or brief announced it did not oppose the Sixth Circuit's decision. (This writer knows from conversations last month with Michigan assistant attorneys-general that Attorney General Michael Cox's office did consider but declined to file an amicus brief.)

*Brown* noted:

> ...As in *Humana*, the fact that the State "filed no brief at any stage of this lawsuit urging that application of RICO to the alleged conduct would frustrate any state policy or interfere with the State's administrative regime" further supports the conclusion that the there is no impairment here. *Id*, at 314, 119 S Ct 710.

> *Brown*, supra.

Cassens next asserts, "Plaintiffs argue, in essence, that Cassens has wrongfully disputed their workers compensation claims...." (Brief 20). Not true. Plaintiffs claim Cassens has *fraudulently deprived* them of their benefits – not merely disputed the benefits, but schemed dishonestly to cheat plaintiffs of their benefits.

Cassens then argues, "Plaintiffs' claims are within the unique expertise of the Bureau of Workers Compensation." False again. The Agency (formerly the Bureau) *has no jurisdiction to hear plaintiffs' claims of fraudulent denial or termination of benefits.* The Agency decides only if benefits are due an injured worker under the conditions set forth in the WDCA. Whether the carrier/adjuster fraudulently denied or terminated benefits is never litigated in a workers compensation hearing; the hearing *addresses only whether the worker is disabled and whether the disability is work-related.*

31

The abstention or primary jurisdiction doctrine argument is not applicable to this case *Burford v Sun Oil Co*, 319 US 315, 63 S Ct 1098, 87 L Ed 1424 (1943), held that dismissal of a complaint is appropriate if the matter involves an issue of substantial state concern and the state has devised a comprehensive regulatory scheme for resolution of such matters in a uniform matter. *Burford* and the cases cited by Cassens are inapplicable because Michigan's Workers Disability Compensation Act, MCL 418, 101 et seq, does not provide *any* scheme for resolution of the fraud claim made in this case, let alone a "comprehensive regulatory scheme."

Numerous post-*Burford* cases applying it to RICO claims have held that the involvement of federal law in RICO cases negates abstention, *New Beckley Mining Corp v United Mine Workers of America,* 946 Fed 1072 (4th Cir 1991), *Taffeta V Southern Co,* 930 F 2d 847 (11th Cir 1991), *County of Suffolk v Long Island Lighting Co*, 907 F 2d 1295 (2d Cir 1990), *Waddell & Reed Fin Inc v Torchmark Corp,* 180 F Supp 2d 1235 (D Kan 2001).

Cassens has failed to cite *Rouse v DaimlerChrysler Corp,* 300 F3d 711 (6th Cir 2002), which sets forth the law in the Sixth Circuit as to how *Burford* should be applied. *Rouse* negates Cassen's argument that this court should abstain.. *Rouse* said:

> "[t]he *Burford* abstention should not be applied unless: (1) a case presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or (2) the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." 300 F3d at 716

Plaintiffs' case does not present "difficult questions of state law" and does not "bear on policy problems of substantial public import whose importance transcends the result in the case then at bar."    Nor would this case "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."    Cassens has presented no proof of these

elements. Under *Rouse*, this court should not abstain.

Whether plaintiff has a claim for benefits should be decided by the Bureau of Workers Disability Compensation.  But whether defendants have *fraudulently conspired to deprive him of benefits in violation of RICO* may only be decided by this court.  The Bureau has no jurisdiction over such a claim.  Because no state administrative agency has jurisdiction over plaintiff's claim for fraud, the doctrine of primary jurisdiction does not bar his claim.

> IV.  NEITHER FAILURE TO PLEAD DAMAGES, THE *ROOKER-FELDMAN* DOCTRINE, NOR COLLATERAL ESTOPPEL BARS ANY OF PLAINTIFF'S CLAIMS

Dr. Drouillard argues:

> Regardless of the outcome at any stage in these proceedings, the plaintiffs' RICO claims will be barred either by their failure to prove an injury or damages, or by the doctrine of collateral estoppel and/or the doctrine referred to as the *Rooker-Feldman* doctrine pursuant to *District of Columbia Court of Appeals v Feldman,* 60 US 462 (1983), and *Rooker v Fidelity Trust Co,* 263 US 413 (1923).

The argument that plaintiffs who allege they have been defrauded of workers compensation benefits cannot prove damages was rejected in *Brown*, supra:

> **B. Plaintiffs Have Sufficiently Pleaded that Their Injuries Were "By Reason of" the Defendants' Alleged Fraud.**
>
> Plaintiffs have sufficiently pleaded that the defendants' fraud was directly related to and was the proximate cause of their injuries as required by 18 USC §1964(c) under *Holme*s, 503 US at 268, 112 S Ct 131,, and *Anza*, 547 US at 456-61, 126 S Ct 1991.

33

Accepting the facts as recited in the complaint, the defendants' fraudulent acts were a "substantial and forseeable cause" of the injuries alleged by the plaintiffs: the deprivation of their worker's compensation benefits and expenses for attorney fees and medical care...

Plaintiffs here have pleaded that by means of defendants' fraud Sedgwick cut off or denied their workers compensation benefits (weekly wage loss payment and medical care), forcing them to pay attorney fees and expenses to get their benefits, and to experience delay in the receipt of their benefits.   *Brown's* holding applies here, and forecloses Dr. Drouillard's argument.

The *Rooker-Feldman* argument is also inapplicable.  It applies only to deprive this court of jurisdiction of a claim already decided in a state court.    No state court has decided whether Dr. Drouillard has defrauded or conspired to defraud plaintiffs of their workers compensation benefits and in so doing has violated RICO.

Collateral estoppel is similarly inapplicable, because the issue of whether Dr. Drouillard has defrauded or conspired plaintiffs under RICO has not been decided, nor could it have been decided in a state administrative proceeding; Michigan's Workers Compensation Agency has no jurisdiction over a RICO claim.


/s/ Marshall Lasser
Marshall Lasser PC, by
Marshall Lasser P25573
po box 2579
Southfield MI 48307
(248) 647 7722
mlasserlaw@aol.com
ddtalon@gmail.com

Dated: July 23, 2009

34

C:\wp51\DOCS\CocaColaRICO\Reply12(b)motion.wpd